NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190779-U

NO. 4-19-0779

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 30, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.A.G. and D.J.G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 18JA66 |
| v. | ) | |
| Delilah D., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the judgment of the trial court that terminated
respondent's parental rights because the trial court's findings were not against the
manifest weight of the evidence.

¶ 2 Respondent, Delilah D., is the mother of D.A.G. (born August 2016) and D.J.G.

(born January 2018). In October 2019, the trial court found (1) respondent was an unfit parent

and (2) termination of respondent's parental rights would be in the minor children's best inter-

ests. Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-in-

terest determination were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Procedural History

¶ 5         In July 2018, the State filed a petition for adjudication of wardship, alleging that

D.A.G. and D.J.G. were neglected minors as defined by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2016)) in that their environment was injurious to their welfare due to (1) respondent's alcohol or substance abuse, (2) the father's alcohol or substance abuse, and (3) while in respondent's and the father's care, the minors had access to illegal substances and a loaded handgun. The day after the petition was filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6        In September 2018, the trial court conducted an adjudicatory hearing. By agreement, the father, Darren G., stipulated to the allegations in paragraph 2—namely, Darren had unresolved issues of alcohol and substance abuse—and the State dismissed the allegations in paragraphs 1 and 3. As a factual basis in support of the stipulation, the State said that Stephan Brown, a detective with the Bloomington Police Department, would have testified that he was investigating drug sales out of respondent's home, at which Darren was living. The police found cannabis that was packaged for sale and the prescription drug Xanax. Darren admitted to Brown that he used cannabis. The court found that the factual basis supported the stipulation, accepted the stipulation, and found the minors were neglected.

¶ 7        In October 2018, the trial court conducted a dispositional hearing. The court entered a written order finding that it was in the best interest of D.A.G., D.J.G., and the public that they be made wards of the court and adjudicated neglected minors. The court further found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors, and it would be contrary to the minors' health, safety, and best interest to be in her custody. The court placed guardianship and custody with the guardianship administrator of DCFS. The written order further admonished respondent

that she was required to cooperate with DCFS and "comply with the terms of the service plan and correct the conditions that require the minor(s) to be in care or [she] risk[ed] termination of [her] parental rights."

¶ 8        In March 2019, the trial court conducted a permanency review hearing at which evidence was presented regarding respondent and her relationship with Darren. At the conclusion of that hearing, the court entered a written order stating, in part, the following: "[Darren] is to have no contact with the minors unless approved by [DCFS]."

¶ 9                                B. The Termination Hearing

¶ 10        In August 2019, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent because she failed to (1) protect the children from conditions within their environment injurious to the children's welfare, (2) make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect, and (3) make reasonable progress to-ward the return of the children within the nine-month period of November 2018 to August 2019. 750 ILCS 50/1(D)(g), (m)(i)(ii) (West 2016).

¶ 11                                1. *The Fitness Proceedings*

¶ 12        In October 2019, the trial court conducted the fitness portion of the termination hearing to address respondent's parental fitness. The State first requested the trial court take judi-cial notice of the orders in its court file, which the court did without objection. The State next submitted the results of various drug screens from respondent conducted over the life of the case. Respondent tested positive for marijuana in two of the drug screens: (1) July 2018 and (2) June 2019. Finally, the State presented an evidence stipulation signed by all parties.

¶ 13        The evidence stipulation first described the reasons why the minors were taken

into protective custody. Specifically, in July 2018, the police executed a search warrant at respondent's home and found "crack cocaine, cannabis, alprazolam [(Xanax)], and a loaded handgun all in open areas accessible to the children." Respondent, Darren, and the children were home at the time. Respondent told DCFS investigators that (1) Darren frequently came and went from the home and others "were frequently in and out of her home" and (2) respondent was suspicious of this activity, but Darren always assured her that everything was all right.

¶ 14        Regarding respondent's compliance with her service plan, the evidence stipulation stated that respondent completed substance abuse treatment in December 2018. Respondent completed a mental health assessment, but no counseling was recommended. Respondent visited regularly with the children, and the visits went well.

¶ 15        The evidence stipulation further stated that Cynthia Rodgers, a DCFS caseworker, spoke to respondent several times between January and March 2019. Rodgers noted that respondent admitted that she allowed illegal drugs and a gun to be in her home and acknowledged her responsibility for creating that dangerous environment. Respondent expressed remorse over her role in losing her children and expressed how she would do things differently so that it would not happen again. Respondent "was aware and agreed not to allow unapproved, unsupervised visits between [Darren] and the minor children." Respondent pledged that she would do whatever it took to get her children back and would never allow guns in her home.

¶ 16        The evidence stipulation stated that the children were returned to respondent on April 9, 2019, and Darren was placed on mandatory supervised release on April 19, 2019. Rodgers, respondent, and Darren had a meeting on June 24, 2019, to discuss Rodgers' concerns over their relationship. At the meeting, respondent stated they were "working on their relationship" and she often visited Darren at his apartment on her off days while the children were at day care.

Respondent denied allowing any unsupervised contact between Darren and the children. Respondent agreed to submit to a drug screening, which came back positive for illegal drugs.

¶ 17　　　　The evidence stipulation then described the July 17, 2019, arrest of Darren and respondent. The police went to respondent's house looking for Darren, who had a warrant for his arrest in an ongoing investigation and was wanted for a parole violation. Respondent "initially refused to open the door even after being told that [Darren] had warrants for his arrest." After the officers threatened to enter by force, respondent opened the door, went outside, and told the officers that she had not seen or spoken to Darren in days. At the same time, officers saw Darren escaping from a second story window. The police arrested respondent and Darren and found a gun in the home.

¶ 18　　　　After her arrest, respondent made several statements to a police detective. Respondent said that per DCFS, Darren was not allowed in the house or around the children. Respondent explained that Darren showed up at her doorstep at 5:30 a.m. Respondent let him in because he claimed he was in trouble and "grabbed his pants insinuating that he had a gun." Respondent admitted the children were in the residence and stated she got them ready and took them to daycare. When she returned, Darren was still present and "told her he wasn't leaving *** until 'someone comes to get me.' " Respondent "was hopeful that she could resolve the situation on her own," but shortly thereafter, a police officer knocked on the door. At that time, Darren was standing in a room looking out the window. "[Respondent] said, 'I was just trying to get them to leave….I knew he was going to go out the window.' "

¶ 19　　　　The trial court admitted the State's evidence without objection. Respondent did not present any evidence.

¶ 20　　　　The trial court found that the State had proved all three allegations of unfitness

listed in the petition—that is, that respondent failed to (1) protect the children from injurious conditions, (2) make reasonable efforts, and (3) make reasonable progress—by clear and convincing evidence. The court, relying on its prior orders and the evidence stipulation, recounted the history of the case. The court noted that respondent and Darren were arrested for engaging in behavior that was very similar to the circumstances that caused the children to come into care in the first instance. The court stated respondent acted against both DCFS directives and the court's admonishment by permitting Darren to enter the home with a gun. The court further stated respondent was "not cooperative, not honest with law enforcement on that occasion."

¶ 21　　　　　Regarding reasonable efforts and progress, the trial court acknowledged that respondent had made reasonable progress in April 2019 when the children were returned to her care. However, the court emphasized that it had to consider the entire nine-month time period. Respondent had engaged in the same behavior, testing positive for marijuana and permitting a dangerous environment. The court noted that after the children were returned, "she makes the same type of decision again that led to the children being removed." The court also noted that respondent directly contradicted the court's order to not allow contact between Darren and the children. Accordingly, the court found respondent was an unfit parent.

¶ 22　　　　　　　　　　　2. *The Best-Interests Proceedings*

¶ 23　　　　　Immediately following the fitness proceedings, the trial court conducted a hearing regarding whether it was in the children's best interests to terminate respondent's parental rights. Reland Carter testified that she was a child welfare specialist at DCFS and she took over the case from Rodgers in August 2019. Carter stated she (1) reviewed the case file, (2) discussed the case with Rodgers, and (3) met with respondent in person. Carter explained that the children were living with their maternal grandmother, Yolanda Cole, in Chicago. The children had lived with

Cole beginning in July 2018 and continued to live with her since then, except for the three months they were returned to respondent.

¶ 24        Carter testified that Cole had a three-bedroom home "in a very nice neighborhood." The children had a "very close relationship" with Cole and "a routine, structured life." Based on Carter's personal observations, the children (1) were bonded to Cole, (2) had a sense of attachment with her, (3) had a sense of belonging in her care, and (4) felt safe and secure with her. Cole had also indicated she was willing to provide permanency through adoption. Carter opined that it was in the children's best interests for respondent's parental rights to be terminated.

¶ 25        On cross-examination, Carter stated that respondent visited the children two or three times a month and "FaceTime[d]" (*i.e.*, video chatted) with them at least twice a day, including every evening before bed. Carter acknowledged that respondent completed a mental health assessment in August 2019 and had been going to counseling for about six weeks. Carter further acknowledged that respondent had gotten an order of protection against Darren.

¶ 26        Cole testified that she was the maternal grandmother and current foster parent for the children. Cole stated that when the children were returned to respondent, Cole visited them every other weekend and FaceTimed with them daily. Cole affectionately described the children as "rambunctious little people" and "happy-go-lucky." The children got along like normal siblings and missed their parents but were generally happy. When asked how she felt about the children, Cole said, "I love them with everything in me." Cole believed the children were bonded and attached to her. Cole stated she was 48 years old, healthy, and worked as a registered nurse. She lived alone with the children and intended to adopt the children if parental rights were terminated. Cole said she did not have backup caregivers yet but had family and nursing friends that

could assist her.

¶ 27 On cross-examination, Cole testified that respondent was her daughter and she had seen respondent interact with the children on numerous occasions. Cole stated that respondent "loves her children very much" and when respondent visited, she cooked, cleaned, and took care of the children. Cole explained that respondent "takes over and does everything. I sit back and watch when she comes to visit." Cole noted that the children loved respondent and talked with her every day. Cole opined that the children were bonded and attached to respondent.

¶ 28 Cole testified that she had seen Darren interact with D.A.G. and she never had any concerns with how he treated D.A.G. Cole stated that before July 2018, she FaceTimed with the children daily and visited them on weekends once or twice a month. Cole further stated that the children lived down the street from her before they moved to Bloomington and she saw them every day during that time.

¶ 29 Respondent testified that she was 24 years old, loved her children, and was bonded with them. Respondent described her relationship with her daughter (who was three at the time) as "kind of tough" because her daughter "knows what's going on, and she knows that she doesn't have both of her parents like she used to." Whenever respondent visited, her daughter asked to go home with her. Respondent stated she had FaceTimed with the children daily since her release in July 2019. Regarding the July 2019 incident, respondent stated that she should have never let Darren in and instead should have closed the door and called the police.

¶ 30 Respondent stated she completed all services required of her. Respondent also stated she was currently in counseling, where she was learning to be more independent and have healthier relationships. In particular, she now understood that she cannot change people or fix their criminality, and she would "walk away" from any relationship that was similar to the one

she had with Darren. Respondent stated she received a two-year order of protection against Darren "to create distance between us."

¶ 31 Respondent believed she needed three months to demonstrate to the trial court that she could keep her children safe. Respondent stated it was not in her children's best interest to terminate her rights because she had always been able to take care of the children and provide for them. Respondent worked full time as a certified nursing assistant. She believed she could provide a permanent and stable home for her children. Respondent further testified that her children loved her and she was concerned that their growth and development would be adversely affected if her rights were terminated.

¶ 32 On cross-examination, respondent acknowledged that the children were removed from her care because of her substance abuse and because of Darren's activities in her home. Respondent explained that she knew he was doing drugs but not that he was selling them or that there was a gun. Respondent stated that the only service she had to engage in was substance abuse treatment, which she completed, but conceded that she also needed to prevent guns and drugs from entering her home to get her children back.

¶ 33 When asked how she was going to keep those things out of her house, respondent said she would be more aware of the people she let in the home. Respondent stated that she should have asked more questions and investigated more back in July 2018 when the children were initially taken. She was planning on surrounding herself with "better individuals, more like-minded people than I did before."

¶ 34 When asked if Darren was the problem, respondent said he would not come around anymore. Darren was in prison, but even if he got out, respondent did not want him to see her. Respondent got a two-year order of protection but acknowledged that she had previously

been under a court order not to allow him in her home and she violated that order. Respondent explained that she did not allow police into her home in July 2019 because she "felt guilty because *** I knew I had messed up." She also felt guilty "[a]bout letting him in in the first place," and "guilty of *** betrayal" of Darren. Respondent stated she did not know Darren was in trouble, was trying to protect herself, and thought she could fix the situation. Respondent admitted she was protecting Darren from the police both in July 2018 and in 2019.

¶ 35     Respondent acknowledged no service existed that could teach her better judgment. However, respondent stated counseling was helping her work on herself and her own issues by letting people in and accepting help. On cross-examination by the State, respondent acknowledged she was still facing charges from the July 2019 incident and a conviction would impact her employment.

¶ 36     On redirect examination, respondent explained that she had been offered "[f]irst offender probation," and if she completed it, the conviction would not be on her record. Respondent agreed that the incident in July 2018 was similar to the incident in July 2019 and what she did in those situations was wrong.

¶ 37     The State and guardian *ad litem* argued that respondent's parental rights should be terminated because (1) the children had spent most of the last year and a half living with Cole and (2) respondent's decisions showed that the children's safety could not be guaranteed in her care. Respondent and Darren both argued that respondent should be given a chance to prove she had changed so that the children could grow up in the care of their mother.

¶ 38     The trial court found that it was in the children's best interests to terminate respondent's parental rights. The court stated it had considered the statutory factors "in the context of the *** children's age and developmental needs." The court began by noting that the case had

been going on for 15 months and the children had been in Cole's care for 12 of those months, which was a significant portion of the children's lives. The court then recapped the history of the case, including (1) the reason the children were brought into care, (2) respondent's compliance with services and the March 2019 permanency hearing, and (3) how the court viewed respondent's actions before and after July 2019.

¶ 39       When examining the best interest factors, the trial court identified those it considered "somewhat neutral." The court explained that it believed respondent and Cole could develop the children's identity, provide community ties, foster feelings of love and attachment, and provide food, shelter, health, and clothing. The court also stated it expected the children to express a desire to be with their parents at their age but they could not appreciate the impact of their parents' choices. Accordingly, the court believed that factor was also neutral.

¶ 40       The trial court explained the most important factors were (1) physical safety, (2) the sense of security, familiarity, continuity of affection, and least disruptive place, and (3) the need for permanency. The court noted that respondent had failed to learn from the incident that brought the children into care, in that she permitted an extremely similar circumstance to occur a second time and in violation of the court's order. Further, the court found that "[t]he children being with their *** maternal grandmother is a much safer place, a dependable place, structure, consistency, things that children need at that age." Regarding permanency, the court noted that the case had been going on for 15 months and respondent needed 9 months to get her children back the first time, only for her to make the same mistake. Although respondent was hoping to get probation, the need for further court proceedings and the uncertainty of them weighed in favor of termination. Accordingly, the court found it was in the children's best interest to terminate respondent's parental rights.

¶ 41　　　　This appeal followed.

¶ 42　　　　　　　　　　　　II. ANALYSIS

¶ 43　　　　On appeal, respondent argues that the trial court's (1) fitness determinations and (2) best-interest determinations were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 44　　　　　　　　　A. The Fitness Determination

¶ 45　　　　Respondent argues the trial court's finding that the State proved all three grounds of unfitness by clear and convincing evidence was against the manifest weight of the evidence. It is well settled that "[a]s the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003). Based on our review of the record, we conclude that the trial court's finding that respondent failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 46　　　　　　　　　1. *The Standard of Review*

¶ 47　　　　A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *Id.*

¶ 48　　　　　　　　　2. *Reasonable Progress*

¶ 49　　　　The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *M.C.*, 2018 IL App (4th)

180144, ¶ 22. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child ***." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001); see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, 83 N.E.3d 485. Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future,* will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 50          3. *The Trial Court's Finding in This Case*

¶ 51          Respondent argues that the record demonstrates she completed all of her services and did everything that was asked of her. She asserts that she was not responsible for Darren's showing up at her doorstep in the early morning hours with a gun. Even so, respondent contends she handled the situation, got her kids to safety, and did not let Darren interact with the children.

¶ 52 Although respondent was fortunately able to avoid any physical harm to her children, the evidence supports the trial court's finding that she failed to make reasonable progress. The evidence stipulation established that respondent was keenly aware that Darren was not permitted to be in her home while the children were present. Contrary to respondent's claims, respondent never stated Darren did not have contact with the children. The evidence stipulation makes clear that respondent (1) got the children ready while Darren was in the house and (2) told the police she knew Darren was not supposed to be there. At most, the trial court had to make a small and imminently reasonable inference to conclude Darren had some contact with the children.

¶ 53 Regarding safety, respondent told police she let respondent in "because he said he was in trouble and grabbed his pants insinuating that he had a gun." It is unclear if respondent felt she had to let him in to protect her and her children, but she later got the children ready and took them to daycare. At that point, respondent could have and should have informed DCFS or the police what had happened. Upon her return, Darren told her he would not leave until "someone comes to get me." When the police knocked on her door, respondent had the perfect opportunity to end the threat. Instead, she lied to the police despite their telling her Darren had a warrant for his arrest. For a person to lie to the police who are looking for a fleeing fugitive who is in that person's house with a gun when they "kn[o]w he [is] going to go out the window" is unquestionably an extremely dangerous situation. This danger was no less present when the children were home, and respondent's refusal to cooperate with police even after the children were safely at daycare supports the trial court's determination that respondent lacked the judgment necessary to keep her children out of these situations in the future.

¶ 54         The trial court noted that respondent was not honest with the police when they ar-

rived at her home. Additionally, respondent tested positive for marijuana, and her substance

abuse was a basis for removal. The court acknowledged it was a "close call" and that respondent

had made progress earlier. But the court found particularly important the fact that respondent

made the same bad decisions when she was presented with the same dangerous situation that led

to removal. The Illinois Supreme Court has held that "the benchmark for measuring a parent's

'progress toward the return of the child' *** encompasses the parent's compliance with the ser-

vice plans *and the court's directives, in light of the condition which gave rise to the removal of*

*the child ***.*" (Emphasis added.) *C.N.*, 196 Ill. 2d at 216-17. Here, the court found that respond-

ent violated "a Court directive that she not allow contact with [Darren] because of the significant

problems that have occurred during that contact," which is "the same issue" that caused the chil-

dren to come into care. Accordingly, we conclude the trial court's determinations that respondent

failed to make reasonable progress toward the return of D.A.G. and D.J.G. was not against the

manifest weight of the evidence.

¶ 55                    B. The Best-Interests Determination

¶ 56                    1. *The Applicable Law and Standard of Review*

¶ 57         At the best-interests stage of a termination proceeding, the State bears the burden

of proving by a preponderance of the evidence that termination of parental rights is in the child's

best interests. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). In

reaching a best-interests determination, the trial court must consider, within the context of the

child's age and developmental needs, the following factors:

        "(1) the child's physical safety and welfare; (2) the development of the child's

        identity; (3) the child's familial, cultural[,] and religious background and ties;

- 15 -

(4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32; see also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 58       A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 59                                    2. *This Case*

¶ 60       Respondent argues that Darren's decision to "barge[ ] into [respondent's] home didn't change all the good things [respondent] accomplished." Respondent contends that all the best interest factors weigh in her favor. Respondent's argument fails for two reasons. First, the focus at the best interests stage is on the children, not respondent. Second, the trial court considered all of the factors and found that the majority of them were "somewhat neutral." That is, the court recognized that respondent could largely provide for the children just as well as Cole. However, the most important factors to the court all weighed in favor of termination.

¶ 61       Cole provided for physical safety, as well as security, familiarity, continuity of

affection, and the least disruptive placement alternative. Respondent's handling of Darren's appearance on her doorstep resulted in the children being placed back into care after just three months of living with their mother and nearly one year to the day they were removed in the first place for very similar conduct. More important, the court recognized that the children needed permanence, and Cole was ready, willing, and able to provide that permanency through adoption, while respondent had to (1) complete her criminal case, (2) successfully complete probation, assuming it was given, and (3) demonstrate that she could exercise better judgment than she had shown with Darren. Even if everything went flawlessly, the court concluded the uncertainty and time delay was outweighed by the permanence the children were entitled to. Accordingly, we conclude the trial court's finding that it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 62    We note that respondent did take positive steps both before and after her arrest. Rather than giving up, respondent engaged in counseling after the permanency goal changed to substitute care. Further, she stayed very engaged in her children's lives, always complying with visitation and video chatting with them multiple times a day. And she obtained a two-year order of protection against Darren. All of these actions are commendable and are seen all too infrequently in similar cases that come before this court. We recognize, as the trial court did, that respondent loves her children and made positive strides after they came into care. But the question on appeal is not whether the evidence could have supported a different outcome; instead, the question is whether the evidence is *contrary* to the determination made by the trial court, which is in the best position to make that determination. Unfortunately for respondent, the evidence supports the trial court's decision in this case.

¶ 63    In conclusion, we thank the trial court for its detailed findings on the record at the

termination hearing, which this court found particularly helpful to the resolution of this case.

¶ 64                            III. CONCLUSION

¶ 65          For the reasons stated, we affirm the trial court's judgment.

¶ 66          Affirmed.