# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *In re M.C.*, 2018 IL App (4th) 180144

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* M.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Sean C., Respondent-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-18-0144 |
| Filed | July 27, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 16-JA-111; the Hon. Thomas E. Little, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Monica Hawkins, of Decatur, for appellant.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Presiding Justice Harris and Justice Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1   In August 2016, the State filed a petition for adjudication of wardship with respect to M.C., the minor child of respondent, Sean C. In December 2016, the trial court made the minor a ward of the court and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in October 2017. Following a hearing on the State's motion in January 2018, the court found respondent unfit. In February 2018, the court determined it was in the minor's best interests that respondent's parental rights be terminated.

¶ 2   On appeal, respondent argues the trial court erred in (1) finding him unfit and (2) terminating his parental rights. We affirm.

### I. BACKGROUND

¶ 4   In August 2016, the State filed a petition for adjudication of wardship with respect to M.C., born in October 2015, the minor child of respondent and Sandra F. The petition indicated respondent resided at Graham Correctional Center. The State alleged the minor was neglected pursuant to section 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b) (West 2016)) because she was not receiving the proper care as necessary for her well-being because police officers were dispatched to a rollover accident, where the car suffered major damage. Officers found no one in the car but did find two nearly empty bottles of liquor, an item of drug paraphernalia, baby clothing, and a baby bottle. An investigation revealed Sandra F. was driving the vehicle and children were in the car at the time of the crash. Sandra F. denied being in an accident and did not take the children to the hospital because she did not want to be arrested. Her driver's license was invalid, and a child reported Sandra F. had been beaten up by her boyfriend. Based on the reported accident, the State also alleged the minor was abused pursuant to section 2-3(2)(i) and (ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(i), (ii) (West 2016)) because her parent, immediate family member, or any person responsible for her welfare created a substantial risk of physical injury, by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function.

¶ 5   The trial court found probable cause for filing the petition based on Sandra F.'s issues with substance abuse, mental health, and domestic violence. The court granted temporary custody to DCFS.

¶ 6   By the time the State filed the verified petition for adjudication, respondent had been identified as the father of M.C. He was, at that time, in the Illinois Department of Corrections and had been since before M.C. was born. After genetic-test results were obtained, a judgment of parentage was entered naming respondent as the father of M.C. in November 2016.

¶ 7   In December 2016, the trial court found M.C. was abused or neglected because she suffers from a lack of support, education, or remedial care due to Sandra F.'s substance-abuse, mental-health, and domestic-violence issues. In its December 2016 dispositional order, the court found respondent was unfit and unable to care for, protect, train, educate, supervise, or discipline the minor and placement with him is contrary to the health, safety, and best interests of the minor because he will be imprisoned until 2024. The court also found Sandra F. similarly unfit and unable to parent M.C. because of her substance-abuse, mental-health, and

domestic-violence issues. The court adjudicated the minor neglected, made her a ward of the court, and placed custody and guardianship with DCFS.

¶ 8   In October 2017, the State filed a motion to terminate respondent's parental rights. The State alleged respondent was unfit because (1) he is depraved in that he has been convicted of 13 felonies since 1990 and is currently serving an 18-year prison sentence for armed violence with a projected release date of February 2024 (750 ILCS 50/1(D)(i) (West 2016)); (2) M.C. is in the temporary custody or guardianship of DCFS, and respondent was incarcerated as a result of a criminal conviction at the time the motion to terminate parental rights was filed, prior to incarceration respondent had little or no contact with M.C., and his incarceration will prevent him from discharging his parental responsibilities for M.C. for a period in excess of two years after the filing of the motion to terminate parental rights (750 ILCS 50/1(D)(r) (West 2016)); and (3) M.C. is in the temporary custody or guardianship of DCFS, respondent was incarcerated at the time of the filing of the motion to terminate parental rights, respondent has been repeatedly incarcerated as a result of criminal convictions, and his repeated incarceration has prevented him from discharging his parental responsibilities for M.C. (750 ILCS 50/1(D)(s) (West 2016)). The State likewise proceeded to terminate Sandra F.'s parental rights.

¶ 9   In January 2018, the trial court conducted a hearing on the State's motion, and respondent appeared in the custody of the Illinois Department of Corrections. Lacey Smith, a child-welfare specialist with DCFS, testified she had been the case leader for M.C.'s case since November 2016. The service plan required respondent to address issues involving substance abuse, mental health, and parenting. Smith was unsure whether respondent was offered substance-abuse or mental-health services with the Illinois Department of Corrections, but respondent did complete two parenting classes. Smith had "some communication" with respondent, and he sent letters and pictures he had drawn for M.C. Smith stated respondent had been in prison since March 2016 and had not successfully completed his service plan. Because his projected release date is 2024, Smith stated respondent would be unable to discharge any parental responsibilities until then.

¶ 10   On cross-examination, Smith stated she had never gone to the prison to meet with respondent, and she had not reviewed the service plans with him. Respondent had a visit with M.C. in January 2017.

¶ 11   Vicki Brown, a visitation specialist with Youth Advocate, testified respondent's visits with M.C. began in January 2017 and continued once a month for one hour. The initial visits were "tough" because M.C. was young and she "did a little bit of screaming." Brown stated respondent did try to interact with her. At subsequent visits, M.C. did not cry as much, and respondent read books to her and colored with her. Respondent also sent money to Brown to obtain snacks.

¶ 12   Respondent testified he has been in custody since February 5, 2015. He received an 18-year sentence for the offense of armed violence. Respondent admitted having a substantial criminal history and noted M.C. was born while he was incarcerated. He agreed he had 13 felony convictions, including offenses in 1990, two offenses in 1996, and offenses in 1997, 1998, 1999, 2001, 2002, 2005, 2009, and 2012. He is set to be released from prison in February 2024, but he stated he expected to begin a program that would allow him to work part-time driving a forklift and sewing prison mattresses and potentially earn two years of good-time credit.

¶ 13      On his own volition, respondent stated he contacted DCFS and indicated he would "like to be able to be involved in this whole thing." He denied receiving a service plan and claimed he "didn't know nothing about substance abuse or mental health assessments until today." He participated in parenting classes on his own. He thought he "could probably get some sort of counseling" if he inquired, but prisoners have to be within two years of their release to get substance-abuse treatment. While in prison in the 1990s and 2000s, respondent received certificates in food safety and custodial maintenance, and he was "around a class or two away from an associate's degree in liberal studies."

¶ 14      When visits began, M.C. did not know respondent, but he stated "they're a lot better" now. While the initial visits were "a little rough," M.C. later allowed him to carry her and put on her coat. Respondent stated he received special permission from the warden to take a birthday card so they could color together, and they "made a mess with cake and ice cream." He stated he sends a card or writes to M.C. every two weeks.

¶ 15      Following arguments by counsel, the trial court found respondent unfit on all three grounds alleged by the State. The court found Smith to be "very credible," and it was "obvious" that respondent would not be in the position to parent M.C. while in prison. While the court found respondent "very forthright" and he demonstrated a willingness and desire to be a loving father, it concluded his criminal history prevented him from parenting M.C.

¶ 16      In February 2018, the trial court conducted the best-interests hearing. Lacey Smith testified M.C. and her brother have been living together in a traditional foster home since August 2016. They "are doing very well" and thriving in that foster home. Smith stated M.C.'s foster parents have "been her primary caretakers throughout her life," and they attend church and community activities. M.C. has a "very strong bond with them," and they take care of her daily needs. Smith stated M.C.'s foster parents "have gone above and beyond" for her and provided her with stability throughout the case.

¶ 17      On cross-examination, Smith testified respondent has sent letters on a regular basis since the case was opened. She stated the earliest respondent could be released from prison would be 2022.

¶ 18      In making its best-interests ruling, the trial court stated it considered the statutory factors and found the most applicable were the child's sense of attachment, the least-disruptive placement alternatives, and the need for permanence. The court found M.C. has bonded with her foster parents, has a "very strong attachment" to them, and has thrived in her environment. M.C.'s foster parents meet her emotional, physical, and medical needs, and they "have expressed a strong desire to adopt the children." The court found it in the minor's best interests that respondent's parental rights be terminated. The court also terminated Sandra F.'s parental rights, and she appeals separately in case Nos. 4-18-0237 and 4-18-0238. This appeal followed.

¶ 19                              II. ANALYSIS

¶ 20                             A. Unfitness Findings

¶ 21      Respondent argues the trial court's findings of unfitness were against the manifest weight of the evidence. We disagree.

¶ 22      In a proceeding to terminate a respondent's parental rights, the State must prove unfitness by clear and convincing evidence. *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172,

177-78 (2006). " 'A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make.' " *In re Richard H.*, 376 Ill. App. 3d 162, 165, 875 N.E.2d 1198, 1201 (2007) (quoting *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90, 819 N.E.2d 813, 819 (2004)). A reviewing court accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27, 31 N.E.3d 254. " 'A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent.' " *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69 (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 517 (2005)).

¶ 23     In this case, the trial court found respondent unfit because (1) he is depraved, (2) his incarceration will prevent him from discharging his parental responsibilities in excess of two years after the filing of the motion to terminate parental rights, and (3) his repeated incarceration has prevented him from discharging his parental responsibilities.

¶ 24     Section 1(D)(s) of the Adoption Act provides as a ground for parental unfitness as follows:

"The child is in the temporary custody or guardianship of [DCFS], the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2016).

¶ 25     In *In re D.D.*, 196 Ill. 2d 405, 419, 752 N.E.2d 1112, 1120 (2001), our supreme court found section 1(D)(s) did not require the repeated incarceration to take place during the child's lifetime. Courts are to " 'consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities ***, such as the diminished capacity to provide financial, physical, and emotional support for the child.' " *Gwynne P.*, 215 Ill. 2d at 356 (quoting *D.D.*, 196 Ill. 2d at 421).

¶ 26     Here, the evidence indicated M.C. was in the temporary custody of DCFS and respondent was incarcerated at the time of the filing of the motion to terminate his parental rights. Moreover, respondent testified he had been repeatedly incarcerated due to his 13 felony convictions. Thus, the remaining issue centers on whether respondent's repeated incarceration has prevented him from discharging his parental responsibilities. Respondent contends he was able to discharge his parental duties because he sent cards and letters to M.C., visited with M.C. and had snacks available during those visitations, had cake and ice cream for her birthday, and enrolled in jobs to gain further skills to support her.

"Being a parent involves more than attending a few visits and sending an occasional gift to the child. The child needs a positive, caring role model present in her life. This ground for unfitness may be utilized regardless of respondent father's efforts, compliance with DCFS tasks and satisfactory attainment of goals, or the amount of interest he has shown in his daughter's welfare." *In re M.M.J.*, 313 Ill. App. 3d 352, 355, 728 N.E.2d 1237, 1240 (2000).

¶ 27     More importantly, respondent's effort to show how he discharged his parental responsibilities by having visits actually works to his disadvantage. It would not be unreasonable to question the parental insight of someone who demands visitation with a child of tender years, a child who does not know him and clearly suffers significant emotional turmoil after being forced to ride for two hours with someone, essentially a stranger, to a

correctional facility. By all accounts, to facilitate a one-hour traumatic visit with a stranger in a strange location, M.C. was required to spend four hours in a car once a month. One can envisage far less traumatic ways to discharge one's parental duties. Respondent is serving an 18-year sentence for armed violence, which is only the last in a series of 13 felony convictions since 1990. He has chosen, as he acknowledged during questioning, to spend "a great part of [his] adult life in prison." He should not have forced that experience on a child of tender years who did not even know who he was.

¶ 28     Although respondent had no knowledge of or relationship with M.C. until the beginning of the case, once paternity was established, he requested visits. In spite of the fact she was only 15 months old, and with the understanding respondent would be in no position to provide placement for the child for at least 8 years, visits were authorized at the penitentiary and M.C. was transported from her foster placement in Bloomington, Illinois, to Graham Correctional Center in Hillsboro, Illinois, once a month by a contracted service provider. This necessitated taking a then-15-month-old child on a nearly two-hour car ride for 117 miles to see someone she did not know in a correctional facility. See *People v. Deleon*, 227 Ill. 2d 322, 326 n.1, 882 N.E.2d 999, 1002 n.1 (2008) (stating a "court may take judicial notice of the distances between two locations"). By the time of the February 2018 best-interests report and over a year of visits, the caseworker reported the "visits go overall well; however [M.C.] is still a little standoffish to [respondent]. [M.C.] struggles with going to [respondent], despite his continued attempts to make her feel comfortable." The caseworker also reported how respondent had to "rely heavily on the visit worker to assist in calming [M.C.] down and meeting her needs during visits."

¶ 29     We recognize the fundamental liberty interest parental rights engender. Both the United States Supreme Court and Illinois Supreme Court have said so. See *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (" 'It is cardinal with us that the custody, care[,] and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' " (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944))); *In re D.W.*, 214 Ill. 2d 289, 310, 827 N.E.2d 466, 481 (2005) ("Indeed, the rights to conceive and raise one's children have been described as among the most ' "basic civil rights of man." ' " (quoting *Stanley*, 405 U.S. at 651, quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942))). However, even in *Stanley*, the Supreme Court believed the rights of unwed fathers deserved protection only so long as there existed a *de facto* family and an established relationship.

¶ 30     It is equally self-evident the State has a compelling interest in protecting the lives, welfare, and safety of children when the parent fails since the primary objective of the Juvenile Court Act is to serve and protect the best interests of children. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336.

> "A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents." *In re Ashley K.*, 212 Ill. App. 3d 849, 879, 571 N.E.2d 905, 923 (1991).

We then question why, after having been found unfit at the adjudication, by stipulation, and obviously being unable to parent M.C. presently or at any time in the foreseeable future, respondent was permitted to demand visitation with a child of tender years, to whom he was a stranger, for no reason other than he is the biological father. This not only ignores the standard of a child's best interests but reinforces what should be a long-dead common-law concept of

children as the property of their father. See Michael Grossberg, Governing the Hearth: Law and the Family in Nineteenth-Century America (1985). Such a practice should not be encouraged under circumstances like the facts in this case. Now that the matter has proceeded to termination of parental rights, and the trial court concluded termination was appropriate, this experience served no beneficial purpose for M.C. and was not in her best interests. Perhaps the even more pertinent question is why such an experience was required in the first place. However, this is a question to be left for another day.

¶ 31 Respondent has been incarcerated for all of M.C.'s life. He has not provided the financial, physical, or emotional support M.C. needs and deserves. His repeated incarceration demonstrates an inability to conform to societal norms and has prevented him from discharging his parental responsibilities. *D.D.*, 196 Ill. 2d at 421. Moreover, his incarceration raises the inference he "will continue to be unavailable and inadequate as a parent." *M.M.J.*, 313 Ill. App. 3d at 355. Based on the evidence in the record, we conclude the trial court's finding of unfitness on this ground was not against the manifest weight of the evidence. Because the grounds of unfitness are independent, we need not address the remaining grounds. See *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003) ("As the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds.").

¶ 32 B. Best-Interests Finding

¶ 33 Respondent argues the trial court's finding it was in the minor's best interests for his parental rights to be terminated was against the manifest weight of the evidence. We disagree.

¶ 34 "Courts will not lightly terminate parental rights because of the fundamental importance inherent in those rights." *In re Veronica J.*, 371 Ill. App. 3d 822, 831, 867 N.E.2d 1134, 1142 (2007) (citing *In re M.H.*, 196 Ill. 2d 356, 362-63, 751 N.E.2d 1134, 1140 (2001)). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights is in a child's best interests, the trial court must consider a number of factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2016). These include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least[-]disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006).

See also 705 ILCS 405/1-3(4.05)(a)-(j) (West 2016).

¶ 35 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*,

2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 36 In the case *sub judice*, the best-interests report indicated M.C. and her older brother have resided in a traditional foster home since August 2016. M.C. was placed with her foster parents when she was 10 months old, and she has bonded with them, knows them as her parents, and shows affection toward them. M.C. and her brother enjoy spending time with their foster parents' extended family members. The report stated the foster parents "have expressed a strong desire to adopt" the minors. M.C. appears to be thriving in the environment, and her emotional, physical, and medical needs are being met. Smith testified respondent has sent cards and letters to M.C., but the earliest he could be released from prison would be 2022. In recommending respondent's parental rights be terminated, the report concluded the "foster parents have demonstrated their ability to not only meet the children's basic needs, but have also demonstrated their commitment to being safe, stable and nurturing parents since August 2016."

¶ 37 The trial court considered the statutory best-interests factors and found M.C.'s foster parents provide her with "arguably the most important of the factors to consider—that's stability." They have met the needs of M.C. and her brother, "maintained for the children a sense of normalcy," and were "committed to providing these children with a safe, stable, and nurturing environment."

¶ 38 The evidence indicated M.C. is in a good home, her needs are being met, and she is thriving in her current placement. Her foster parents are willing to adopt her, which will provide her with the permanency she needs and deserves. Respondent, however, has not been a parent to M.C. during her young life and will remain unable to be a parent for the foreseeable future due to his prison sentence. Considering the evidence and the best interests of the minor, we find the trial court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 39                                    III. CONCLUSION
¶ 40 For the reasons stated, we affirm the trial court's judgment.

¶ 41 Affirmed.