NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200025-U

NO. 4-20-0025

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
|     Petitioner-Appellee, | ) | No. 17JA191 |
|     v. | ) | |
| Cody C., | ) | Honorable |
|     Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court. Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the trial court's termination of respondent's parental rights because the trial court's findings were not against the manifest weight of the evidence.

¶ 2      Respondent, Cody C., is the father of G.C. (born July 2017). In December 2019, the trial court found respondent was an unfit parent and, in January 2020, it found termination of respondent's parental rights would be in the minor's best interest. Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 3                  I. BACKGROUND

¶ 4                  A. Procedural History

¶ 5      In August 2017, the State filed a petition for adjudication of wardship, alleging in relevant part that G.C. was a neglected minor as defined by the Juvenile Court Act of 1987 (Act)

(705 ILCS 405/2-3(1)(b) (West 2016)) in that her environment was injurious to her welfare due to her parents' (1) substance abuse and (2) domestic violence. On that same day, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6          In November 2017, the trial court conducted an adjudicatory hearing. Respondent stipulated to the allegations described above. The court accepted the stipulation, found G.C. was a neglected minor, and found that a factual basis supported the stipulation.

¶ 7          In January 2018, the trial court conducted a dispositional hearing. The court entered a written order finding that it was in the best interest of G.C. and the public that G.C. be made a ward of the court and adjudicated a neglected minor. The court further found (1) respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor and (2) it would be contrary to the minor's health, safety, and best interest to be in his custody. The court placed guardianship and custody with the guardianship administrator of DCFS. The written order further admonished respondent that he was required to cooperate with DCFS and "comply with the terms of the service plan and correct the conditions that require the minor to be in the care [*sic*] or [he] risk[s] termination of [his] parental rights."

¶ 8                              B. The Termination Hearing

¶ 9          In June 2019, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to G.C.'s welfare, (2) make reasonable efforts to correct the conditions which were the bases for the removal of G.C. during any nine-month period following the adjudication of neglect, and (3) make reasonable progress toward the

return of G.C. within the nine-month periods of December 2017 to September 2018 and September 2018 to June 2019. 750 ILCS 50/1(D)(b), (m)(i), (ii) (West 2018).

¶ 10                    1. *The Fitness Proceedings*

¶ 11        In December 2019, the trial court conducted the parental fitness portion of the termination proceedings.

¶ 12                    a. Christine Foster

¶ 13        The State first presented the testimony of Christine Foster, the "Parenting Educator" for the Youth Advocate Program, which received the referral to provide respondent parenting services. Foster explained that respondent's attendance was "sporadic." Foster attempted to contact and schedule meetings with respondent in August and September 2017. Foster showed up at supervised visits on two occasions to make appointments. However, respondent did not show up for one appointment and cancelled the other. Foster was eventually able to meet with respondent to perform the initial assessment and begin services.

¶ 14        Foster testified that respondent completed the "Nurturing Parenting curriculum." Respondent continued to cancel scheduled meetings and did not show up in the fall and winter of 2017. Foster stated respondent's attendance was "pretty good" for the months of January and February 2018. Foster did not see respondent between March and August of 2018. Foster said that respondent had reported he was working during that period. Respondent continued his "sporadic" attendance between August and October 2018.

¶ 15        Foster testified that respondent had just started the "Protective Factors" part of the curriculum, which dealt with domestic violence, a reason for G.C.'s coming into care. Foster noted that she tested respondent before and after completing the curriculum and respondent's scores declined slightly the second time he was tested. Foster testified that she dropped in on 13

visits during the life of the case in an effort to contact and engage respondent. Foster last heard from respondent in October 2018. Foster stated respondent "was a very loving dad," and he did very well with G.C. during visits. Foster believed that respondent did not successfully complete parenting services because "protective factors" was a curriculum she believed he "really *** needed."

¶ 16　　　　On cross-examination, Foster agreed there were no safety concerns with respondent interacting with G.C. and believed there was a bond between them. Foster acknowledged that respondent cancelled many appointments for reasons including attempting to find housing and employment as well as his work schedule when he had employment. However, Foster said she was flexible and maintained that parents needed to make sacrifices and make their children a priority even if they have busy schedules. Foster stated respondent completed about three sessions of the "Protective Factors" curriculum.

¶ 17　　　　　　　　　　　b. Amanda Aubert

¶ 18　　　　Amanda Aubert testified that she was a "House Advocate" at the Youth Advocate Program, and she worked with respondent to find independent housing between November 2017 and June 2018. Respondent initially showed up to meetings and applied for multiple apartments. Respondent was denied for apartments due to his criminal background and poor credit in December 2017 and February 2018. In January 2018, respondent found an apartment to live at and was to be employed by the property manager but the arrangement "fell through." At the end of January 2018, respondent began living at the "Freedom House"—a transitional living house. Respondent started cancelling appointments in March, stopped showing up in April, and Aubert was unable to contact him despite leaving several voicemails. In June 2018, after speaking with

the caseworker, Aubert "decided to close the case, due to lack of communication and participation in the program."

¶ 19                                     c. Michelle McRoberts

¶ 20        Michelle McRoberts testified that she was a therapist and counselor at Youth Advocate Program. When McRoberts began meeting with respondent, respondent was initially very distrustful. However, respondent was eventually able to "open up" and "have very candid discussions *** about his struggles." McRoberts reported that respondent attended 15 of 25 scheduled sessions. Respondent attended regularly between November 2017 and February 2018 (cancelling appointments on a few occasions), but he began "no show[ing]" in March and April 2018 such that McRoberts unsuccessfully discharged him. Respondent got a new referral and reengaged in September 2018 but again cancelled and "no showed." McRoberts last saw respondent in November 2018 and unsuccessfully discharged him in December 2018.

¶ 21        McRoberts testified that respondent "made a lot of progress" and that he "really learned some coping skills" to help him deal with his anxiety, but "there was still progress that could have been made." Respondent had demonstrated using "a variety of th[ose] coping skills" in his daily life. McRoberts explained a practical example in that respondent tended to get angry and walk out of child and family team meetings, which McRoberts explained was a valid coping skill to prevent him from acting out angrily. He was working on being able to make it through an entire meeting without walking out but was unable to accomplish that goal. McRoberts said respondent did not successfully complete his mental health services.

¶ 22                                     d. Kim Taylor

¶ 23        Kim Taylor testified that she was a supervisor with DCFS and had been assigned the case from the beginning. Taylor stated that G.C. was brought into care because she was born

substance exposed and "there was a domestic violence incident." Taylor explained that the initial service plan goals consisted of (1) substance abuse services, (2) mental health treatment, (3) domestic violence, (4) parenting services, and (5) independence.

¶ 24 Taylor testified that respondent was rated overall "unsatisfactory" at his first evaluation in February 2018. Respondent was rated satisfactory in some areas and was attending services. Taylor relayed the remainder of the performance reviews for respondent and he never achieved a satisfactory rating. Taylor explained, similar to the previous witnesses, that respondent would sporadically engage in services and eventually "his addiction would overcome [him] and he would drop off from the services that he needed to commit to." Taylor noted that respondent never found independent housing, self-reported "using and relapsing," and was not able to demonstrate an extended period of sobriety.

¶ 25 Taylor testified that respondent's "visits went very well with his daughter," but he missed many visits and had not seen G.C. since October 2018. Taylor noted that respondent provided for G.C., spent his entire visitation focusing on her, and never had any concerning interactions with her. Taylor opined that respondent would not be able to complete the necessary services to have G.C. returned to him within the next six to nine months because his addiction was "too much for him" and the amount of services he needed to complete too great.

¶ 26 On cross-examination, Taylor acknowledged that G.C. lived with respondent for the first six weeks of her life. G.C. was taken into protective custody because respondent violated the safety plan in place, which barred G.C.'s mother from having any unsupervised contact. Respondent was not permitted to supervise any visits because of domestic violence between him and the mother. Taylor agreed that respondent would periodically engage in services and then

"drop off" but stated that respondent merely attended the services and did not make progress because he was unable to demonstrate that he was implementing what he learned from services in his daily life.

¶ 27 Respondent did not present any evidence.

¶ 28 e. The Trial Court's Finding

¶ 29 The trial court found that the State had proved all three allegations of unfitness listed in the petition—that is, that respondent failed to (1) maintain a reasonable degree of interest, (2) make reasonable efforts, and (3) make reasonable progress—by clear and convincing evidence. The court recounted the witness testimony in detail and stated that it believed the witnesses were credible. In summarizing the testimony, the court included statements from each witness that respondent did not complete the necessary services. Accordingly, the court found respondent was an unfit parent.

¶ 30 2. *The Best-Interest Proceedings*

¶ 31 In January 2020, the trial court conducted proceedings regarding whether it was in G.C.'s best interest to terminate respondent's parental rights. Taylor testified that G.C. had been living with a foster family since August 2017, since she was one month old. Taylor stated that G.C. was "developmentally on target," and was "well integrated into that home." The foster family was meeting G.C.'s needs, and G.C. had a "strong bond" with her foster family's biological children. G.C. called the foster parents "mom and dad," and the foster parents "expressed a strong desire to adopt" G.C. Taylor reported that the family had "unconditional love" for G.C., who was "thriving in this environment." Taylor opined that it was in G.C.'s best interest to continue to live with her foster family and to terminate respondent's parental rights.

¶ 32 On cross-examination, Taylor acknowledged that respondent's visits had all gone

well and she had no safety concerns. Respondent was prepared, interacted well with G.C., and had a bond with her. However, Taylor noted that G.C. had not seen respondent in over a year and it would take between 9 and 12 months for respondent to be able to care for G.C.

¶ 33    Respondent testified that he cared for G.C. for the first six weeks of her life and never had any problems meeting her needs. Respondent explained that he was always prepared for his visits with G.C., such as by bringing age-appropriate food, toys, and books, and they had developed a bond. G.C. even called him dad. Respondent stated that he was going to be released from jail in fewer than 60 days and he had housing and support to help transition him back into the community. Respondent further stated that he loved G.C. and acknowledged he "made a mistake by drinking and driving," but he maintained that he could complete the necessary services within six to nine months.

¶ 34    The trial court found that it was in G.C.'s best interest to terminate respondent's parental rights. The court stated it had considered all of the statutory factors and "[t]he ones that I believe are most applicable to this case include the child's sense of attachment, where the child has a sense of security, a sense of familiarity, continuity, and the least disruptive placement alternative for the child." The court further stated "consistent with that, an additional statutory factor for me to consider is the child's need for permanence, including the child's need for stability and continuity of relationships with parent[al] figures, with siblings, and other relatives." The court noted that (1) G.C. was "very bonded to her current foster parents" and their children, (2) "[s]he refers to them as mommy and daddy," and (3) the foster parents "expressed a strong desire to adopt [G.C.]" Further, G.C. was "thriving in this environment," and the foster family had "demonstrated an unconditional love for this child," which the court noted it "d[id]n't often see

that." The trial court also noted it had considered respondent's testimony and believed respondent "does love his child, but he is not in a position to provide stability." Accordingly, the court found it was in G.C.'s best interest to terminate respondent's parental rights.

¶ 35    This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37    Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the court's judgment.

¶ 38                        A. The Fitness Determination

¶ 39    Respondent argues the trial court's findings that the State proved all three grounds of unfitness by clear and convincing evidence were against the manifest weight of the evidence. It is well settled that "[a]s the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003). Based on our review of the record, we conclude that the trial court's finding that respondent failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 40                        1. *The Standard of Review*

¶ 41    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. A reviewing court will not reverse a trial court's finding of parental unfitness unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *Id.*

¶ 42                              2. *Reasonable Progress*

¶ 43          The State must prove unfitness as defined in section 1(D) of the Adoption Act by

clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *M.C.*, 2018 IL App (4th)

180144, ¶ 22. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who

fails to make "reasonable progress toward the return of the child" during any nine-month period

following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois

Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the re-

turn of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compli-

ance with the service plans and the court's directives, in light of the condition which gave rise to

the removal of the child ***." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001);

see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, 83 N.E.3d 485. Likewise, this court has de-

fined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court,
>
> based on the evidence before it, can conclude that the progress being made by a
>
> parent to comply with directives given for the return of the child is sufficiently de-
>
> monstrable and of such a quality that the court, in the *near future,* will be able to
>
> order the child returned to parental custody. The court will be able to order the
>
> child returned to parental custody in the near future because, at that point, the par-
>
> ent *will have fully complied* with the directives previously given to the parent in
>
> order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill.
>
> App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 44                     3. *The Trial Court's Finding in This Case*

¶ 45          Here, the State presented evidence that respondent "sporadically" engaged in the

required services and failed to complete any of them. Although respondent did make progress both in his mental health and parenting classes, he had not completed the most important parts of the curriculum. McRoberts stated respondent attended 15 of 25 appointments and had only begun to implement some of the coping strategies they discussed in his daily life. Foster testified that respondent had attended only three classes on "Protective Factors," which she believed was essential for him to complete because it addressed domestic violence and that was one of the bases for G.C.'s coming into care. Respondent also failed to obtain independent housing and admitted to Taylor that he failed to maintain sobriety—another basis for G.C.'s coming into care.

¶ 46　　　　　Although respondent's visits went well, he had not seen G.C. in over a year. At the time of the hearing, respondent was incarcerated and could not complete his services for at least six to nine months. We note that respondent was given 18 months to make reasonable progress on his services, twice the amount of time he was entitled to, and he still failed to do so. Accordingly, we conclude the trial court's determination that respondent failed to make reasonable progress toward the return of G.C. was not against the manifest weight of the evidence.

¶ 47　　　　　　　　　　B. The Best-Interest Determination

¶ 48　　　　　　　　　　1. *The Applicable Law and Standard of Review*

¶ 49　　　　　At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties;

(4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32; see also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 50    A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 51                                      2. *This Case*

¶ 52    The trial court repeatedly noted G.C. was doing extremely well in her placement with her foster family. She had a strong bond with her foster parents, called them "mom and dad," and had a strong bond with her foster siblings. G.C. had been living with the foster family for two and a half years—all but one month of her life—and that family was meeting all her needs. Further, the foster parents expressed a strong desire to adopt G.C. and "demonstrated an unconditional love" for her. The court stated the factors that stuck out most included the child's sense of attachment, security, and continuity of affection and the need for stability and continuity

of relationships. The evidence presented as well as the trial court's findings support this conclusion. Accordingly, we conclude the trial court's finding that it was in G.C.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 53                                III. CONCLUSION

¶ 54            For the reasons stated, we affirm the trial court's judgment.

¶ 55            Affirmed.