NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210148-U

NOS. 4-21-0148, 4-21-0149 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 4, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | No. 17JA28 |
| v.      (No. 4-21-0148) | ) | |
| Darrick R., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* A.R., a Minor | ) | |
| | ) | No. 17JA29 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-21-0149) | ) | Honorable |
| Darrick R., | ) | Thomas W. Funk, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in finding respondent unfit to parent his minor children.

¶ 2     On September 24, 2020, the trial court found respondent, Darrick R., unfit to parent

his minor children, J.R. (born June 27, 2014) and A.R. (born February 13, 2016). On March 8,

2020, the court terminated respondent's parental rights. Respondent appeals, arguing the court

erred in finding that he was an unfit person under sections 1(D)(m)(i) and 1(D)(m)(ii) of the

Adoption Act (750 ILCS 50/1(D)(m)(i)-(ii) (West 2018)). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On August 9, 2017, the State filed petitions for adjudication of wardship, alleging J.R. and A.R. were neglected, as that term is defined under the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2016)). Specifically, the petitions alleged the children were neglected in that their environment was injurious to their welfare as evidenced by the failure of respondent and Karissa M., the mother of J.R. and A.R., to ensure the children were provided a safe and nurturing environment (*id.* § 405/2-3(1)(b)). Each petition further alleged the children's environment was injurious to their welfare as a result of domestic violence between respondent and Karissa (*id.*). Finally, the State alleged J.R. and A.R. were neglected because A.R. was not receiving medical care or support necessary for her wellbeing (*id.* § 405/2-3(1)(a)). The same day, the trial court conducted a shelter care hearing and entered an order granting the Department of Children and Family Services (DCFS) temporary custody of the minors.

¶ 5            On September 14, 2017, Karissa entered into a stipulation acknowledging that J.R. and A.R were neglected in that A.R. had not received medical care or support that was necessary for her wellbeing. In association with the stipulation, the assistant state's attorney informed the trial court that, if the matter were to proceed to a hearing, the State would produce evidence that A.R. suffered a burn after playing near a hot stove, and neither respondent nor Karissa sought medical treatment for the injury.

¶ 6            Subsequently, the Rutledge Youth Foundation (RYF), an agency operating under contract with DCFS, filed a family service plan. Under the plan, respondent was required to, among other things, participate in weekly visits with the children and cooperate with RYF to successfully complete his services.

¶ 7        The trial court conducted a dispositional hearing on October 26, 2017. At the conclusion of the hearing, the court found respondent unfit to parent J.R. and A.R. and determined he needed to complete an integrated assessment through RYF and any recommended services. The court made the minors wards of the court and granted custody and guardianship of the minors to DCFS.

¶ 8        On September 10, 2018, RYF filed a revised family service plan. Under this plan, in addition to the requirements contained in the initial service plan, respondent was required to participate in random drug testing, complete a domestic violence assessment and a substance abuse assessment, participate in parenting classes and individual counseling, and apply the skills he learned in his parenting classes during his visits with his children.

¶ 9        On November 5, 2018, the State filed a petition to terminate respondent's parental rights. (We note the State also sought to terminate the parental rights of Karissa and that, ultimately, her parental rights were terminated. However, Karissa is not a party to this appeal, and we discuss the facts only as they relate to respondent.) In its petition, the State alleged respondent was an unfit person under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2016)) in that, from September 15, 2017, through June 15, 2018, and from January 31, 2018, through October 31, 2018, he failed to make reasonable efforts to correct the conditions that were the basis for removal of the minors from his care. The State further alleged respondent was an unfit person under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) in that, during the same period, he failed to make reasonable progress toward the return of the minors to his care.

¶ 10       The trial court conducted a fitness hearing on May 2, 2019. During the hearing, the State first presented the testimony of Tiesha Hawkins, J.R. and A.R.'s first caseworker at RYF.

Hawkins testified that respondent completed an integrated assessment in either October or November of 2017 and, based upon the results of the assessment, was required to complete parenting classes, substance abuse treatment, individual counseling, and domestic violence counseling. According to Hawkins, respondent participated in individual counseling and in domestic violence counseling and had completed the required parenting classes. However, Hawkins also testified respondent had difficulty applying what he learned in the parenting classes during his visits with the children. Hawkins further testified that, while she was the caseworker, respondent was employed with a construction company and did not have a "consistent *** nine to five schedule," but she tried to "work around" respondent's schedule to ensure he completed his services. As a result of respondent's unpredictable work schedule, he had been unable to complete substance abuse treatment, had missed "quite a few" weekly visits with the children, and, when he did appear for a visit with the children, was usually late.

¶ 11        The State also presented testimony from Codi Poe, J.R. and A.R.'s caseworker at RYF from July 2018 until December 2018. Poe testified that, while she worked as the children's caseworker, respondent completed domestic violence counseling, showed appropriate parenting skills with the children, and attended substance abuse counseling and individual counseling sessions. However, Poe also testified that, as a result of respondent's work schedule, he regularly missed counseling sessions and was late for visits with the children.

¶ 12        Respondent did not present any evidence at the fitness hearing.

¶ 13        After the parties presented argument, the trial court denied the petition to terminate parental rights. The court found respondent had "completed each and every task that [he had] been required to do." Although the court denied the petition to terminate parental rights, the children

remained wards of the court in the custody of DCFS.

¶ 14 Following the fitness hearing, the trial court conducted permanency review hearings on March 14, 2019, November 7, 2019, and April 23, 2020. At each of these permanency review hearings, the court found respondent remained unfit to parent J.R. and A.R. and had not made reasonable and substantial progress or reasonable efforts toward returning the minors home.

¶ 15 On October 30, 2019, RYF filed another family service plan. Under this plan, in addition to the goals set forth in the previous plans, respondent was required to, among other things, participate in parenting coaching and engage in a financial literacy program. The plan also required respondent to participate in couple's counseling with Karissa and to attend J.R.'s and A.R.'s mental health and medical appointments.

¶ 16 On April 15, 2020, the State filed a second petition to terminate parental rights. In this petition, the State alleged respondent was an unfit person in that he: (1) was subject to habitual drunkenness or addiction to drugs, other than as prescribed by a physician, for at least one year prior to April 15, 2020 (750 ILCS 50/1(D)(k) (West 2018)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of his children between November 1, 2018, and August 1, 2019, and between July 10, 2019, and April 10, 2020 (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of his children between November 1, 2018, and August 1, 2019, and between July 10, 2019, and April 10, 2020 (*id.* § 1(D)(m)(ii)). The State also alleged it was in the best interest of J.R. and A.R. that respondent's parental rights be terminated.

¶ 17 The trial court conducted a fitness hearing on September 11, 2020. During the hearing, the State presented testimony from Jonathan Eck, a parenting coach at The Parent Place.

Eck first provided respondent coaching services in March 2019, but respondent was ultimately discharged from the program in July 2019 after he failed to schedule his final coaching session. Eck further testified that respondent later reengaged in the service in May 2020 and completed the program in August of that year. According to Eck, during all of respondent's coaching sessions, respondent was "fully engaged" and "receptive to everything that [Eck] was presenting."

¶ 18　　　　The State also called Bailey Bridges, the children's caseworker at RYF from January 2019 until August 2020. Bridges testified that respondent disengaged from individual counseling in June 2019 and from parenting coaching services in July 2019, failed to appear for 11 drug screenings between January 2019 and April 10, 2020, and tested positive for marijuana three times during that time frame. Around May of 2019, after respondent tested positive for marijuana, Bridges asked respondent to reengage in substance abuse counseling, which he had previously completed, but respondent never reengaged in that service. According to Bridges, respondent claimed he was unable to attend some drug screenings because he did not have transportation, even though he knew RYF would provide him a ride to his appointment if required. Bridges further testified that between September 2019 and April 2020, respondent missed 17 out of his 26 scheduled visits with the children even though DCFS had changed the visitation schedule so the visits occurred on Saturdays when respondent did not work. According to Bridges, although respondent provided a justification for missing some of his visits, he missed 11 of them because he failed to check in with RYF the day before the visit. Bridges explained that, because respondent had missed so many visits since the children were taken into care, RYF required that he contact the agency some time before 4:30 p.m. each Friday to confirm he would attend the visit scheduled for the next day. Bridges testified that, when respondent did attend visits, he had difficulty

parenting the children. As an example, Bridges testified that, as a form of discipline, respondent would sit the children in front of a television for a brief period. As a further example, Bridges testified respondent had fed J.R. four peanut butter sandwiches for a meal and, on other visits, did not have any food for the children. Although Bridges opined respondent's parenting skills had improved since she first took over as the children's caseworker, she stated his parenting ability could not be fully assessed because he had missed so many visits. Bridges also testified that respondent failed to comply with the requirement in his service plan that he maintain stable housing. According to Bridges, when she first started working as J.R. and A.R.'s caseworker, respondent was living with Karissa in government housing, which she had obtained. Bridges explained respondent was ineligible to live in this housing complex because he was not on the lease and because he earned more money than was permitted for residents of the complex. Later, respondent moved to another apartment complex but was subsequently evicted for failing to pay rent. As of the date of the fitness hearing, respondent was renting a home in Lincoln, but Bridges testified the home was not a proper place for the children to return to because respondent did not have any beds or other furnishings for the children. Finally, Bridges testified that respondent did not attend any of the children's medical or mental health appointments he had been informed of and was allowed to attend. Although Bridges told respondent that, if he could not attend an appointment, he could call the children's provider after the appointment and ask for updates regarding the children's health, Bridges testified he never did.

¶ 19          After the State concluded its evidence, the trial court continued the fitness hearing to September 24, 2020. At the continued hearing, respondent testified on his own behalf. Respondent testified that he was a foreman with Helitech Waterproofing and Foundation Repair

and had been employed there for approximately five and a half years. Confirming testimony from other witnesses, respondent testified that he completed parenting classes, parenting coaching, domestic violence counseling, and a financial literacy program. Respondent acknowledged that he smoked marijuana but testified that he only smoked the substance at most one day a week. Respondent further testified that the reason he had to miss visits with his children was because of his work schedule. He explained that, as part of his job, he was required to travel all around Illinois, Iowa, and Indiana, and that his schedule was never consistent. Although, generally, respondent did not work weekends, he was now required to work overtime on some Saturdays. However, respondent conceded that he had missed many in-person visits with his children because he "forgot to confirm" the visit a day in advance, as required by DCFS. Respondent also conceded that when his visits with the children were changed to take place over the phone or online as a result of the coronavirus pandemic, he still missed some visits because of problems with his phone or because he overslept. According to respondent, he enjoyed his visits with his children, had a stable home, and had sufficient money set aside to purchase items for the children if they were returned to him.

¶ 20        After the presentation of evidence, the trial court found respondent was an unfit person under section 1(D)(m)(i) because he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children between July 10, 2019, and April 10, 2020. The court also found respondent was an unfit person under section 1(D)(m)(ii) because he failed to make reasonable progress toward the return of the children between November 1, 2018, and August 1, 2019.

¶ 21        Subsequently, the trial court conducted a best interest hearing at the conclusion of which it found termination of respondent's parental rights was in the best interest of J.R. and A.R.

¶ 22        This appeal followed.

¶ 23                    II. ANALYSIS

¶ 24        Section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2018)) "sets forth a two-step process for the involuntary termination of parental rights." *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 20, 77 N.E.3d 69. First, the trial court must find, by clear and convincing evidence, that "[the] parent is an unfit person as defined in Section 1 of the Adoption Act [(750 ILCS 50/1 (West 2018))]." 705 ILCS 405/2-29(2) (West 2018). After a finding of parental unfitness is made, the court then considers whether termination of the parent's rights is in the minor's "best interest." *Id.* In the present case, respondent only challenges the court's determination that he was an unfit person under the Adoption Act.

¶ 25        "A reviewing court accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.*

¶ 26        Following the fitness hearing, the trial court determined respondent was an unfit person based upon two of the five grounds alleged by the State. However, in order to affirm the court's judgment, we need only find that the State sufficiently established respondent was an unfit person on a single ground. See *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30, 43 N.E.3d 139 ("As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence supports it on any one of the grounds alleged."). Here, we find the trial court's determination that the State proved respondent was an unfit person under section 1(D)(m)(ii) of

the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) was not against the manifest weight of the evidence.

¶ 27 Section 1(D)(m)(ii) of the Adoption Act states that a parent is an unfit person if he fails to "make reasonable progress toward the return of the child to [him] during any 9-month period following the adjudication of neglect[ ] or abuse[ ] *** under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m)(ii) (West 2018). We have previously determined that:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original and internal quotation marks omitted.) *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

Further, reasonable progress is measured by a parent's "compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." (Internal quotation marks omitted.) *Id.* ¶ 50. Finally, "in determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m)." *In re J.L.*, 236 Ill. 2d 329, 341, 924 N.E.2d 961, 968 (2010).

¶ 28	Here, the trial court found respondent failed to make reasonable progress toward the return of J.R. and A.R. from November 1, 2018, through August 1, 2019. The evidence presented at the fitness hearing demonstrated that at no point during that period were the minor children close to being returned to respondent's care. Specifically, although respondent had successfully completed several services, concerns remained about his overall compliance with the service plan and with his ability to parent the children. Even though respondent had completed parenting classes, he had trouble properly disciplining the children and discontinued parenting coaching services. Respondent also stopped attending individual counseling services and failed to reengage in substance abuse treatment after testing positive for marijuana. Respondent was also rated unsatisfactory in attending J.R. and A.R.'s medical appointments. Although these appointments generally occurred when respondent was working, respondent never called the provider afterwards to inquire about what had happened at the appointment or to learn about his children's diagnoses and progress. Finally, during this time period, respondent did not have adequate housing. He was living at Karissa's apartment in violation of her lease agreement.

¶ 29	Even assuming, *arguendo*, that the trial court's finding that respondent failed to make reasonable progress between November 1, 2018, and August 1, 2019, was against the manifest weight of the evidence, as respondent argues, we note the State also alleged respondent was unfit for failing to make reasonable progress towards the return of J.R. and A.R. to his care between July 10, 2019, and April 10, 2020. Although the court did not rely on this allegation to find respondent was an unfit person, we may affirm the court's decision on any basis established by the record. *In re K.B.*, 314 Ill. App. 3d 739, 751, 732 N.E.2d 1198, 1208 (2000). The evidence presented at the fitness hearing showed that, during this time frame, respondent still was not in

compliance with portions of his service plan. Significantly, the evidence showed that respondent failed to attend 17 out of his 26 scheduled visits, and as a result, RYF was unable to evaluate whether respondent had benefitted from parenting services. Although respondent was excused from some of these visits, he missed 11 of them simply because he failed to contact RYF at any time during the week preceding the visit to confirm he would attend. This despite RYF scheduling the visits to occur when respondent was not working. Notably, after visits were changed to take place online and over the phone, respondent still missed visits because of circumstances that were easily within his control.

¶ 30    In light of the evidence presented at the fitness hearing, we cannot say that the trial court's finding that respondent was an unfit person was against the manifest weight of the evidence.

¶ 31                    III. CONCLUSION

¶ 32    For the reasons stated, we affirm the trial court's judgment.

¶ 33    Affirmed.