NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200098-U

NO. 4-20-0098

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 7, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.I., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 18JA14 |
| v. | ) | |
| Anne Marie G., | ) | Honorable |
| Respondent-Appellant). | ) | Adam M. Dill, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's termination of respondent's parental rights because the trial court's findings were not against the manifest weight of the evidence.

¶ 2   Respondent, Anne Marie G., is the mother of S.I. (born August 2005). In November 2019, the trial court found respondent was an unfit parent and, in January 2020, it found termination of respondent's parental rights would be in the minor's best interest. Respondent appeals, arguing that the court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 3                    I. BACKGROUND

¶ 4                    A. Procedural History

¶ 5   In January 2018, the State filed a petition for adjudication of wardship, alleging in

relevant part that S.I. was a neglected minor as defined by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2016)) in that her environment was injurious to her welfare because "said environment exposes the minor to [respondent's] history of and continued mental illness." Also in January 2018, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6        In April 2018, the trial court conducted an adjudicatory hearing. Respondent stipulated to the allegations described above. The court accepted the stipulation and found that (1) S.I. was a neglected minor and (2) a factual basis supported the stipulation.

¶ 7        In May 2018, the trial court conducted a dispositional hearing. The court entered a written order finding that it was in the best interest of S.I. and the public that S.I. be made a ward of the court and adjudicated a neglected minor. The court further found (1) respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor and (2) the health, safety, and best interest of the minor would be jeopardized if the minor remained in her custody. The court placed guardianship and custody with the guardianship administrator of DCFS. At the hearing, the court admonished respondent of her need to cooperate with DCFS and follow the terms of any service plans or court orders or else she risked termination of her parental rights.

¶ 8                        B. The Termination Hearing

¶ 9        In August 2019, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because she failed to make reasonable progress toward the return of S.I. within the nine-month period of November 2018 to August 2019. 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 10                                    1. *The Fitness Proceedings*

¶ 11          In November 2019, the trial court conducted the fitness portion of the termination

proceedings.

¶ 12                                    a. Judy Osgood

¶ 13          The State first presented the testimony of Dr. Judy Osgood, a licensed clinical

psychologist. Osgood testified as an expert witness and stated she evaluated respondent for

DCFS in April 2019. Osgood explained that she reviewed medical records and reports from

DCFS in addition to conducting an in-person interview with respondent, during which she

administered several psychological tests. Osgood diagnosed respondent as having bipolar

disorder, "parent/child relational problem[,] and personal history of psychological trauma."

Bipolar disorder for respondent meant that she went through periods of severe depression—

including loss of sleep and energy, suicidal ideations, and suicide attempts requiring

hospitalization—followed by manic symptoms resulting in "a loss of control over emotions and

behaviors," which led to "incidents of domestic violence."

¶ 14          Osgood opined that people with bipolar disorder "have an extremely difficult time

establishing stability without medication as a basis of treatment." Osgood recommended

respondent receive (1) psychiatric treatment, (2) psychotropic medication as prescribed,

(3) individual counseling, (4) support groups and community resources, and (5) "assistance in

applying for disability" to maintain economic stability. Osgood stated that medication was

"number one" in terms of importance because "it was very clear to [her] that without psychiatric

treatment and ongoing medication management, including compliance in taking it, that

[respondent's] ability to really manage her bipolar disorder was really next to impossible."

Osgood continued that respondent had reported that she had not taken her medication since

January 2019 because she was unemployed and could not afford it.

¶ 15 Regarding S.I., Osgood testified that it was her understanding that S.I. had experienced "a lot of trauma and instability with [respondent]." S.I. did not want to speak with respondent at that time and had lived through respondent's suicide attempt and domestic violence. Osgood believed that visitation with respondent should be conducted only to the extent S.I. could "tolerate visits." Osgood emphasized, based on respondent's history of mental illness, respondent would have an extremely hard time maintaining stability in employment and with relationships without consistently taking medication and engaging in psychiatric treatment and counseling. In her written psychological evaluation, which the trial court admitted into evidence, Osgood opined, "Currently, due to the severity of [respondent's] untreated [mental disorders], [respondent] does not appear capable of safely and responsibly parenting her children."

¶ 16 b. Meredith Brumfield

¶ 17 Meredith Brumfield testified that she was a caseworker at Lutheran Social Services (Lutheran Services) between August 2018 and May 2019. When Brumfield was assigned to the case, respondent had "already self-engaged in services" by attending individual counseling with Christina Hoppin and psychiatric treatment from Dr. Martin Repetto at Gibson Behavioral Wellness Center (Gibson Wellness). Brumfield explained that she was unable to contact respondent until meeting with her in November of 2018 because the contact information in the file was inaccurate. After meeting with respondent, Brumfield learned that respondent had stopped attending counseling with Hoppin in June 2018 because respondent had a new job and could not take time off. Respondent reported that her health insurance had not yet started, so she had not been to the doctor. Brumfield believed that respondent did not have a gap in her medication because respondent "said that she had refills at that time."

¶ 18        Brumfield stated that she referred respondent to Osgood in November 2018, but Osgood rescheduled several of the appointments. Brumfield further stated that in February 2019, respondent had lost her job and, consequently, her insurance and Brumfield attempted to get a contract between Lutheran Services and Gibson Wellness so respondent could have continuity of service. Brumfield suggested respondent get "a medical card" but did not specifically inform her how to apply for one. Brumfield did not know if Lutheran Services ever got a contract with Gibson Wellness because she left before it would have been finalized. Brumfield acknowledged that respondent told her she was open to seeing any counselor to reengage in services, but Brumfield never made a referral.

¶ 19        Brumfield testified that she had difficulty communicating with respondent. Brumfield received responses to her emails from respondent, but respondent never addressed applying for a medical card. Brumfield had contact with respondent only if she initiated it despite respondent having both her phone number and email. Respondent never told Brumfield she was out of medication or that she did not have a working phone. Brumfield stated that respondent had not had any visitation with S.I. because S.I. had repeatedly expressed a desire to not have any contact with respondent.

¶ 20                        c. Ellen Pierce

¶ 21        Ellen Pierce testified that she was respondent's caseworker after Brumfield left in May 2019. Pierce stated that the only contact she had with respondent was at a June 2019 court hearing. Respondent told Pierce she had trouble getting a referral from the prior caseworker and that she was willing to reengage in services with anyone the agency desired. Pierce started a referral to Community Resource and Counseling Center (CRCC). Pierce stated that respondent met with Pierce's program director in July 2019 to sign the appropriate consents so the referral

could be completed. The referral was processed in August 2019.

¶ 22        Pierce testified that she had little to no contact with respondent. Pierce sent respondent emails and formal letters because she did not have a working phone number. Respondent never responded to Pierce's communications, but Pierce assumed respondent received them because respondent attended services after being notified by letter.

¶ 23        Pierce stated that respondent was unemployed and did not have a vehicle. Pierce was informed by respondent in June 2019 that "she had applied for Public Aid; however, the waiting list for such services was very long." Respondent began attending services at CRCC on August 29, 2019. CRCC was chosen because it provided both individual counseling and a psychiatrist who could prescribe medication. Pierce did not provide any assistance with receiving medication, but respondent never indicated there was a problem. After the referral, respondent attended every counseling session offered to her and had an appointment in April 2020 with the psychiatrist. Based on CRCC's report, respondent was making progress and "her depression seem[ed] to be better."

¶ 24        Consistent with Brumfield, Pierce reported that respondent had not engaged in visitation with S.I. because S.I. was adamantly against any communication with respondent.

¶ 25        The State concluded by asking the trial court to take judicial notice of its prior orders, specifically the adjudicatory and dispositional orders, which the trial court did.

¶ 26                                d. Respondent's Evidence

¶ 27        Respondent first presented a letter from Dr. Martin Repetto. The parties stipulated that if called, Repetto would testify consistently with the letter's contents. Repetto stated that he provided care for respondent between November 2018 and August 2019. Repetto diagnosed respondent with major depressive disorder and post-traumatic stress disorder, and he treated her

for depression, anxiety, and mood swings. The treatment plan included using "a combination[ ] of antidepressants, mood stabilizers and psychotherapy to stabilize her mood, reduce her symptoms of depression and anxiety and stop her suicidal thoughts."

¶ 28     Repetto stated that respondent saw him for the first time in six months on January 29, 2019. Respondent informed him that she ran out of medication in September 2018 (she had missed a follow up appointment on September 18, 2018), but believed it was unnecessary to keep taking them at that time because she did not notice a change in her mood. In January 2019, however, she decided she wanted to get back into treatment and, although she did not report any symptoms of depression or suicidal thoughts, she wanted to prevent a relapse. Repetto started respondent on Abilify for mood stabilization based on her history of responding well to the medication.

¶ 29     In March 2019, respondent contacted Repetto requesting a call back. He returned the call that day, and respondent informed him she was very depressed because she had lost her job because of an argument with a coworker. Respondent admitted she never restarted taking Abilify and felt "extremely depressed, unable to eat or leave her room." Repetto stated he called the police for a wellness check on respondent after the call but the police informed him that she did not answer the door. Repetto "tried to call her on several occasions, but [his] calls went straight to voicemail." Repetto discharged respondent for lack of compliance with treatment at the end of July 2019.

¶ 30     Respondent testified that on November 20, 2018, (the start of the nine-month period) she was employed at Pavlov Media in Champaign, Illinois. She received health insurance through work, which was provided by Health Alliance. Respondent explained that she received individual counseling services from Hoppin starting at the beginning of the case and continued

through July 2018, when she began work for Pavlov and had to stop seeing Hoppin due to her hours. Respondent further explained that Pavlov's insurance switched to Blue Cross and Blue Shield of Illinois (Blue Cross) in January 2019 and she tried to find out if Gibson Wellness— Hoppin's employer—accepted Blue Cross. Respondent told Brumfield about the change at a review hearing in early January 2019 and that she would need help arranging services if Gibson Wellness did not accept Blue Cross.

¶ 31        Respondent saw Repetto in January 2019 because she needed refills for her medication. She was scheduled for a follow up appointment, but she lost her job and insurance in February 2019. Respondent contacted Brumfield about the loss of insurance, and Brumfield informed her that Lutheran Services "would not help [respondent] with the psychiatrist or the medication, that it would only help [her] with the counseling." Respondent stated she called "Public Aid" numerous times, but they would not cover the prescribed medication. Respondent reported that Abilify cost $2400 a month. Respondent called her state senator for assistance, but his office was unable to help. "I was told by [Brumfield] that [Lutheran Services], their hands were tied. They could only help me with the therapy, not the psychiatry or the medication."

¶ 32        Respondent reported being in two support groups. She joined a depression and bipolar support group in Champaign in January 2018 and attended weekly for about a year. She had to stop attending when she lost her car at the beginning of April 2019. Respondent also attended Celebrate Recover, a Christian-based recovery group similar to Alcoholics Anonymous, during that same period of time. Respondent lost her job in February 2019 and, as a result, lost her vehicle, health insurance, phone, and internet. Beginning in August 2019, respondent's father would drive her to the library generally once a week so that she could check her email. Around that same time, her father had her bicycle repaired so she could travel there herself. Respondent

- 8 -

stated the mail was the best way to contact her and she informed both Brumfield and Pierce of that fact. Respondent began receiving public aid in June 2019. She had a medical card and food stamps.

¶ 33 Respondent stated her primary care physician began prescribing her psychiatric medication, which she began taking in October 2019 after she received her medical card. In August 2019, respondent began individual counseling at CRCC, seeing a counselor and a caseworker there, each once per week.

¶ 34 On cross-examination, respondent clarified that she was employed at Pavlov between July 2018 and February 2019. Respondent acknowledged that she never provided an alternative phone number or suggested that Lutheran Services communicate with her through her father. Respondent further acknowledged that she never sent a letter to Lutheran Services, stating, "There was nothing to communicate."

¶ 35 In response to questions from the trial court, respondent stated she had a "mixed opinion" about Osgood's bipolar diagnosis. Respondent had been engaged with psychiatrists and therapy for over 20 years, and her other psychiatrists did not agree with the diagnosis. Still, respondent stated she was interested in exploring the diagnosis further with her new psychiatrist. The first available appointment was April 2020. Regarding the state of her mental health treatment, respondent agreed with the court that she was in a transition period but maintained she was "doing everything that [she] possibly can at this particular moment." Respondent further stated as follows: "I'm in therapy, which is, even in the short time that I've been in therapy, is— I've made significant improvements, and it's definitely something that needs to be maintained. I know that and I've known that for years."

¶ 36 Respondent told the trial court that she believed she needs medication and she

was taking it. Respondent stated she was taking fluoxetine (generic Prozac) daily and "[i]t has significantly improved my—my depression." Respondent explained that since taking her medication, she had (1) gone back to work, (2) started getting out of the house and using her bike to prevent isolation and loneliness, (3) looked into returning to her Rantoul support group, and (4) closely examined the bus schedule to determine how she could attend all of her appointments in Champaign and Rantoul, none of which would have been possible without medication. Respondent explained how she was prescribed the medication, as follows:

"It took a little while to get into my primary. And I explained to my primary that—my situation with the lag time of being able to see a psychiatrist. I knew that it was not feasible to be off medication that long and asked her if she would manage it until such time that the psychiatrist could take it over. She agreed to that. And she and I came to the conclusion that once the psychiatrist engaged in my medical care, that it would be transferred to him because she felt he was—due to it being his specialty, it would be the better of the two situations."

¶ 37 The trial court then asked respondent the following:

"Q. What's your long-term goal here?

A. My long-term goal is to have a productive life, both personally and professionally. I would—at this point in time, I just want to get to a point where I can have contact with my children. I want to have a relationship with them. If that means that they stay with my sister in the—for the interim or even in the long-term, I just want to have an opportunity to sit down with them and a professional and work through our issues and have a chance to either succeed or fail in that therapy. I'm not asking that they be returned to my home. I just want a

chance to re-engage with them and potentially have a relationship that could go into their adulthood.

Q. So, it sounds as if you agree that—and I know it's not the issue today, but you would agree that where you're at right now is not anywhere close to having [S.I.] come home to live with you?

A. I have work to do. And not just that, but she and I have work to do in our relationship. We haven't seen each other in two years. We haven't had a conversation in two years. And throwing her into my home at this point—or returning her into my home at this point would not benefit either one of us. We have to establish a foundation through a therapist, through a counselor or professional who can re-engage us into a relationship of some kind before that could even be considered. She—we have to get to know each other again. It's not fair to her, it's not fair to me for us to be thrown into that situation without someone who has more knowledge than we do, a professional therapist that can re-establish that between the two of us."

¶ 38 Respondent testified that she was first prescribed medication when she was in college in 1996 and that she had never "voluntarily stopped taking medication." Respondent had managed her mental health with diet, therapy, and exercise, rather than medication, all the way until 2017.

¶ 39 On further cross-examination, respondent clarified that she started taking medication in 1996 but slowly weaned herself off it and managed the condition. Respondent "went back to my doctor" in May 2017 to ask to be placed on medication because she "could tell things were changing." Respondent felt as though she had a "very normal, stable relationship"

with S.I. prior to May 2017. Respondent stated she raised three children (including S.I.) on her own, they were good students, active in sports, and she was very active in their lives. Respondent explained that she had asked Brumfield for the first available counselor but Brumfield insisted on staying with Gibson Wellness. Respondent acknowledged that she told Brumfield that she did not want to see the contracted therapist in Rantoul because respondent knew the therapist personally and felt there was a conflict. Respondent stated that was the only time she refused a referral.

¶ 40       After further cross-examination, the trial court again asked questions of respondent. The court "detected a little anger towards Lutheran Social Services" in respondent's answers. Respondent stated she was "very frustrated with Lutheran Social Services" and explained that she initially provided for all of her own services through her health insurance. However, when she lost her job and insurance in February, respondent told Lutheran Services she now needed its help, but it was unhelpful. Respondent stated she sent numerous emails to Brumfield "begging her to get me set up with someone." Pierce indicated to respondent that Pierce was frustrated with the state of the file because Brumfield's notes were not very thorough. Pierce was able to refer respondent for services, who re-engaged and had been successful.

¶ 41                         e. The Trial Court's Finding

¶ 42       The trial court found that the State had proved by clear and convincing evidence that respondent failed to make reasonable progress. The court summarized the determination it must make as whether the State had proved by clear and convincing evidence that respondent had failed to make reasonable progress during the relevant nine-month period. The court defined reasonable progress as "a demonstrable movement toward the goal of reunification" and noted that "it is irrelevant whose fault it was" that progress was not made.

¶ 43     The trial court recognized that "how can I find clear and convincing evidence that no progress has been made when the opportunity for progress hasn't been provided." The court stated it had "strong concerns regarding the services provided and, at the same time, strong concerns about [respondent's] willingness early on to get engaged in those services until this petition was actually filed." The court indicated that it would only be human for caseworkers to focus more on those who are cooperating than those who are being difficult. The court described respondent's demeanor as "combative" at times during testimony and noted it "detect[ed] anger in her at one point." The court "imagine[d respondent] can be a little difficult to deal with at times." Respondent acknowledged her demeanor as "frustration," and the court understood and empathized with respondent's frustration at finding herself in a situation where, through no fault of her own, because she had a mental illness she might have her parental rights terminated. The court then stated as follows:

> "Blame is irrelevant to me for the findings of this hearing today. *** I believe, at least at a minimal level, even a little bit more than that, the opportunity for services was provided to [respondent]. If it needs to be proven, I believe that was proven by clear and convincing evidence. It's also been proven by clear and convincing evidence that for the relevant time period that we're talking about here pled in the petition, reasonable progress was not made. And that has, as I said, been proven by clear and convincing evidence. We did not have a demonstrable movement toward that goal of reunification.
>
> I recognize how difficult mental illness cases can be. *** [Respondent] has a significant mental illness according to multiple doctors. It requires medication, counseling, and [it is] something that's not going to be cured. It's not

- 13 -

her fault she has that. And part of the symptoms of that \*\*\* is that at points when you're depressed, you withdraw and you don't want to talk to anyone or do anything. And it makes it even more difficult to get those people into the treatment and counseling they need. I recognize all that. \*\*\* But I do believe, as I said, the unfitness, the lack—or the failure to make reasonable progress has been proven by clear and convincing evidence."

¶ 44 Accordingly, the court found respondent was an unfit parent.

¶ 45 2. *The Best-Interest Proceedings*

¶ 46 In January 2020, the trial court conducted proceedings regarding whether it was in S.I.'s best interest to terminate respondent's parental rights. The State presented only the reports submitted by Lutheran Services and the court appointed special advocate (CASA). Each report set forth the relevant statutory factors as headings and addressed thereunder how those factors applied to S.I. Both reports emphasized that (1) S.I. was excelling in her foster home (the home of S.I.'s maternal aunt and uncle), (2) S.I. had not spoken to or seen respondent in over two years, (3) S.I. consistently expressed a desire to be adopted by her foster parents and to continue not having contact with respondent, (4) the foster parents expressed a desire to adopt S.I., and (5) S.I. had strong bonds to her foster family and felt a sense of security and stability in their care.

¶ 47 Respondent submitted letters from her primary care physician and therapist, stating that respondent (1) was consistently attending therapy, (2) was taking prescribed medication and vitamins, and (3) had made significant improvements in her mental health and stability.

¶ 48 Respondent testified that she had stabilized her housing and financial situation.

She had been steadily employed and recently started a new job as a finance manager at a Champaign company. Respondent stated she was receiving therapy, community support services, and psychiatric treatment from CRCC. She had not yet met with the psychiatrist but had an appointment in February 2020. Her community support person had helped stabilize her finances, housing, and medication. With CRCC's help, respondent had obtained a new phone and vehicle.

¶ 49　　　　Respondent stated that she was engaging in therapy once a week. She had set intermediate and long-term goals and was working on both her current and past mental health issues. Respondent acknowledged that she had only made some progress on addressing the issues that caused S.I. to come into care, but she explained that, because she had so many things to address, she had to concentrate on other more immediate problems first. She was working on addressing the issues that caused S.I. to come into care with her therapist but the process was ongoing with more work to be done. Respondent further testified about the coping skills she was learning and described how she was implementing them in her everyday life.

¶ 50　　　　Respondent further testified about the medications and supplements she had been prescribed and the positive impacts they were having. Respondent consistently took her prescriptions, had no trouble obtaining refills, and was working with her providers to make sure she had access to everything she needed. Respondent had further put an emphasis on healthy eating and exercise as part of her mental health regimen. Respondent finally noted that she had not had access to any of these services—financial, medical, and mental health—until August 2019, but since then they had helped "[e]xponentially."

¶ 51　　　　Regarding S.I., respondent acknowledged they had not spoken for a long time because respondent was respecting S.I.'s wishes. Respondent stated she never wanted to cease contact with S.I. Respondent further stated that she had a very positive and deep relationship

with S.I. and S.I.'s current foster family (respondent's sister and brother-in-law) before the case was initiated. She had not spoken to them since, again due to S.I.'s wishes, and respondent believed that the absolute cut off would continue for as long as S.I. wanted if her parental rights were terminated. Respondent stated she strongly wanted to engage in family counseling as soon as possible.

¶ 52　　　　The trial court found that it was in S.I.'s best interest to terminate respondent's parental rights. The court stated it had considered all the evidence at prior hearings, the best interest hearing, and the reports submitted by Lutheran Services and CASA. The court noted it was a difficult decision and "having detailed reports is essential to that determination for me." The court explained that the decision was difficult because respondent was "sick in the sense [that she had a] mental illness," which the court felt as though "society" has not "done a very good job" of "coming to grips" with the "very difficult epidemic" of mental illness.

¶ 53　　　　The trial court believed that it would be in S.I.'s best interest to have a relationship with her biological mother if respondent were healthy. However, the court also recognized that when respondent was not healthy, she "created a chaotic life" for S.I. such that it was not in her best interest to have a relationship with respondent. The court further believed that respondent's delay in getting treatment was likely a combination of (1) the nature of her illness, (2) respondent's refusing to participate, and (3) DCFS's failure to provide timely services. The court noted that to the extent the delay was because "we didn't provide the services necessary to [get her healthy,]" its decision was all the more difficult.

¶ 54　　　　Nonetheless, the trial court made clear that the focus was on S.I. and that S.I. had "excelled at her placement over the last two years with her aunt and uncle. This is a kid who is doing fantastic *** because of [that] support." The court also noted the "value of finality" and

reiterated that S.I. "has succeeded where she's at while this case has been pending." The court again expressed the difficulty it had in making the decision and encouraged respondent to continue treatment so she could establish a relationship with S.I. as an adult. Accordingly, the court found it was in S.I.'s best interest to terminate respondent's parental rights.

¶ 55    This appeal followed.

¶ 56                                II. ANALYSIS

¶ 57    Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the court's judgment.

¶ 58                        A. The Fitness Determination

¶ 59                          1. *The Standard of Review*

¶ 60    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. A reviewing court will not reverse a trial court's finding of parental unfitness unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *Id.*

¶ 61                          2. *Reasonable Progress*

¶ 62    The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); *M.C.*, 2018 IL App (4th) 180144, ¶ 22. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois

Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child ***." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001); see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, 83 N.E.3d 485. Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future,* will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 63                       3. *The Trial Court's Finding in This Case*

¶ 64          Here, after noting that "[b]lame is irrelevant," the trial court found that the State had proven by clear and convincing evidence that Lutheran Services had adequately provided respondent with the opportunity to engage in services. Although there was evidence that suggested Lutheran Services could have done more, the court essentially made a credibility determination that (1) respondent did not engage promptly in services and with the caseworkers and (2) to the extent Lutheran Services did not act as promptly as it could have, it did so because of respondent's combative demeanor.

¶ 65    The trial court also found that respondent had not made a substantial step towards reunification, and that finding is well supported by the record. In particular, in his letter, Dr. Repetto stated that respondent informed him she ran out of medication in September and determined she did not need to take it at that time. However, she saw him in January 2019 to get new prescriptions, which he provided. Subsequently, respondent did not take the medication and, after losing her job, fell into a paralyzing depression. Nonetheless, respondent was able to contact Repetto by phone. Respondent herself acknowledged that she needed to take the medication and that it had a very positive impact on her life. She listed several crucial life activities that she was able to perform—going to work, visiting the library to check email, examining the bus schedule so she could attend appointments, looking to re-engage in support groups—and stated she would not have been able to do them without medication. Respondent's statements confirm Dr. Osgood's opinion that it would be next to impossible for respondent to adequately treat her mental health and gain stability without medication.

¶ 66    Additionally, the trial court appropriately took respondent's mental health problems into consideration when making its finding. The trial court was quite correct that respondent found herself in the situation through no fault of her own in the sense that her mental illness was not the result of any choice she made. And respondent had a particularly hard time because the precise symptoms of her illness made reaching out for help and keeping in contact with caseworkers extremely difficult.

¶ 67    Nonetheless, S.I. was brought into care because of respondent's untreated mental illness. Respondent had 20 years' experience dealing with mental health professionals and managing her illness. She recognized the importance of counseling and medication, but she did not make much, if any, progress during the relevant nine-month period. Respondent had health

insurance and sufficient income at the beginning of the period to engage in treatment and take medication, but she did not. When she lost her job, the problems compounded. Regardless of the level of assistance provided by Lutheran Services, respondent demonstrated her ability to contact others, ask for help, and take the steps required to get treatment during the life of the case. For instance, respondent eventually got her primary care physician to prescribe the necessary medication on a temporary basis.

¶ 68 The upshot of the foregoing analysis can be summarized by respondent's testimony. When the trial court asked her if she agreed that she "right now is not anywhere close to having [S.I.] come home," respondent stated, "I have work to do. And not just that, but she and I have work to do in our relationship. We haven't seen each other in two years. We haven't had a conversation in two years. And *** returning her into my home at this point would not benefit either one of us." Reasonable progress is an objective standard that asks whether the child could be returned home in the near future because the parent will have fully complied with services necessary to correct the conditions that were the basis for removal. Regardless of fault, sufficient evidence exists to support the trial court's finding that respondent did not meet that standard. Accordingly, we conclude the trial court's determination that respondent failed to make reasonable progress toward the return of S.I. was not against the manifest weight of the evidence.

¶ 69 B. The Best-Interest Determination

¶ 70 1. *The Applicable Law and Standard of Review*

¶ 71 At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). In reaching a best-interest determination, the trial court must consider, within the context of the

child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's
> identity; (3) the child's familial, cultural[,] and religious background and ties;
> (4) the child's sense of attachments, including love, security, familiarity,
> continuity of affection, and the least disruptive placement alternative; (5) the
> child's wishes and long-term goals; (6) the child's community ties; (7) the child's
> need for permanence, including the need for stability and continuity of
> relationships with parent figures and siblings; (8) the uniqueness of every family
> and child; (9) the risks related to substitute care; and (10) the preferences of the
> person available to care for the child." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32,
> 147 N.E.3d 953; see also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 72    A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 73                                   2. *This Case*

¶ 74    The trial court repeatedly noted S.I. was doing extremely well in her placement with her foster family. The court relied heavily on the reports submitted by Lutheran Services and CASA, and those reports support the court's finding. S.I. had been living with the foster family for two and a half years, and that family was meeting all her needs. S.I. felt safe, supported, and loved in her foster home. She repeatedly expressed a desire to be adopted and live

with the family permanently, something the foster family also wanted. S.I. was excelling in school, was engaged in the community through sports and extracurricular activities, and had a demonstrable growing sense of self-confidence. Meanwhile, S.I. had not spoken to her mother in years and expressed a strong desire to continue to not have contact. Accordingly, we conclude the court's finding that it was in S.I.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 75        We note that the trial court repeatedly expressed how difficult it was to make the decision. The court recognized respondent's efforts and progress in treating her illness and expressed hope that respondent could continue that progress and someday have a relationship with S.I. as an adult. We join the trial court in recognizing respondent's significant progress in her life. All parties agreed that respondent was doing well, had stabilized her life to a large extent, and was quickly moving in the right direction. Respondent could have let her frustration and depression carry the day and simply given up trying to get treatment. However, even after the expiration of the nine-month period, respondent persevered and engaged in the treatment she needed. We commend her for doing so and strongly hope she will be able to continue her progress. We also commend the trial court for its careful consideration of all the factors in this difficult case, particularly its handling of respondent's mental illness.

¶ 76                            C. Compliance With Rule 311(a)

¶ 77        Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) requires the appellate court to issue a decision in an advanced case—such as this one—within 150 days after the filing of the notice of appeal, except for good cause shown. Respondent filed a notice of appeal on February 20, 2020, and a disposition was due on July 20, 2020. However, this case was not submitted to this court for a disposition until July 23, 2020. The delay is attributable to the

COVID-19 global pandemic and the attendant disruptions caused by shutdown orders, which forced respondent to request multiple extensions of time to file the record and her brief. Given this context, we conclude good cause exists for our exceeding the deadline and note that this panel made every effort to issue this decision in as timely a manner as possible.

¶ 78                               III. CONCLUSION

¶ 79          For the reasons stated, we affirm the trial court's judgment.

¶ 80          Affirmed.