2023 IL App (2d) 220316-U
Nos. 2-22-0316, 2-22-0317, cons.
Order filed January 26, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re Au.F. & Al.F., Minors | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | Nos. 19-JA-20 |
| | ) | 19-JA-21 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Amanda I., | ) | Kathryn Karayannis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*:    In these consolidated appeals, mother's attorney is granted leave to withdraw where counsel demonstrated that there was no nonfrivolous issue to raise on appeal.

¶ 2     On August 26, 2022, the circuit court of Kane County entered orders terminating the parental rights of respondent, Amanda I., in her children Au.F., and Al.F. Amanda appeals the trial court's findings of unfitness in that she: (1) suffered from habitual drunkenness or addiction to drugs (750 ILCS 50/1(D)(k) (West 2018)); (2) failed to protect the children from conditions injurious to their welfare; and (3) failed to make reasonable efforts or progress during a nine-month period after the children were adjudged neglected. Amanda's appointed appellate counsel filed a

motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003), which asserted that there are no issues of arguable merit to be raised on Amanda's behalf. On our own motion, we consolidated the appeals for decision. We grant counsel's motion and affirm the judgment of the circuit court.

¶ 3                                      I. BACKGROUND

¶ 4      On March 6, 2019, the State filed petitions for adjudication of neglect pertaining to the minor children, Au.F. (born February 20, 2015) and Al.F. (born March 30, 2017). The rights of the father of both children, William F. are not at issue here. The case was initiated after Au.F., when he was three, was found wandering his neighborhood alone in July of 2018. The record indicates he was found wandering alone on multiple occasions in Elgin. The amended petitions alleged that the minors were neglected based on the following: (1) Amanda's history and/or issues of substance abuse and William's failure to protect; (2) William's history and/or issues of substance abuse and Amanda's failure to protect; (3) an open "INTACT" case with the Illinois Department of Children and Family Services (DCFS) and Amanda's and/or William's failure to fully cooperate with the recommendations; (4) William leaving the minors with Amanda unsupervised, and William's failure to protect; and (5) Amanda's inadequate supervision of Au.F., placing him and his sibling Al.F. at risk of harm, and William's failure to protect.

¶ 5      A shelter care hearing was held on March 7, 2019. Both parents were present and were appointed attorneys. At the hearing, Jeannette Camacho from Children's Home and Aid Society of Illinois (CHASI) testified that she was an intact caseworker assigned to the cases of both minors in 2018 after the incident with Au.F. Camacho testified that both parents were placed into the Families and Children in Treatment (FACT) program. As part of the program, the parents were drug tested. Camacho was familiar with the results of the parents' drug tests and testified that

Amanda tested positive for benzodiazepines, opiates, Oxycodone, and cannabis in July of 2018; positive for benzodiazepines, opiates, and cannabis on August 14, 2018, and August 16, 2018; positive for benzodiazepines, opiates, buprenorphine, Oxycodone, cannabis, and alcohol on August 23, 2018; and failed to appear for her drug test on August 24, 2018. Amanda did not complete the FACT program and it was terminated on August 30, 2018. Additionally, an integrated assessment was conducted, a domestic violence assessment was completed by William, and Amanda started, but did not complete her domestic violence assessment because she did not want to finish.

¶ 6    A safety plan was put into place in August of 2018. Amanda was not permitted to be with the minors unsupervised from August through December of 2018. Amanda, William, and the children lived together until Amanda moved nearby to a family member's home. A second safety plan was put into place in February of 2019 because Amanda had tested positive for cocaine, opiates, cannabis, THC, amphetamines, and methamphetamines on February 5, 2019. Both Amanda and William denied the results of the drug test and refused to sign the safety plan. Amanda claimed to have prescriptions for any positive drops, but no proof of the prescriptions was presented. On February 28, 2019, Camacho observed Amanda leave William's house with Au.F., get into her car, and drive away in violation of the safety plan. The trial court found probable cause and an urgent and immediate necessity to remove the children from the home. The trial court awarded temporary custody of the minors to DCFS on March 7, 2019.

¶ 7    On June 5, 2019, an adjudicatory hearing was held on the neglect petitions. Amanda stipulated to the allegation that the minors were neglected based on her history and/or issues of substance abuse and William's failure to protect. On June 26, 2019, the trial court found that both

parents were unfit and unable to safely care for Au.F. and Al.F. and the children were made wards of the court. On December 19, 2019, the trial court terminated Amanda's visitation.

¶ 8    On February 25, 2020, the first permanency review hearing was held. At that hearing the goal was changed from return home to substitute care pending the termination of parental rights. Amanda's drug drops showed a decline in drug use. She completed an intake assessment for a substance abuse recovery program with Lighthouse Recovery. She additionally reported to her CHASI caseworker that she was enrolled in a medically assisted treatment for outpatient services related to substance abuse. At the time, however, no treatment programs had been completed. On December 5, 2019, Amanda tested positive for opiates, THC, and amphetamines. She began individual therapy but stopped attending and was assigned another therapist. Amanda did not start domestic violence services. Amanda successfully completed eight parenting classes. Amanda was diagnosed with generalized anxiety disorder, and case management suggested that she seek on-going psychiatric care, but Amanda refused to sign a release for information so caseworkers could not reevaluate her treatment.

¶ 9    At the time of the first permanency review hearing, the children were together in the same foster home and the trial court found that they were doing very well and getting the care and attention they needed.

¶ 10    On June 29, 2020, the State filed petitions to terminate Amanda's parental rights as to both Au.F. and Al.F. The petition alleged that Amanda: (1) suffered from habitual drunkenness or addiction to drugs (750 ILCS 50/1(D)(k) (West 2018)); (2) failed to protect the children from conditions injurious to their welfare (750 ILCS 50/1(D)(g) (West 2018)); and (3) failed to make reasonable efforts or progress during a nine-month period after the children were adjudged neglected (750 ILCS 50/1(D)(m) (West 2018)). A second permanency review hearing was held

intermittently from December 15, 2020, until February 3, 2021. The trial court heard five witnesses, two CHASI caseworkers, a Jewish Child and Family Services of Chicago (JCFS) caseworker, a therapist at Ecker Center for Behavioral Health, and a doctor at the Greater Elgin Family Care Center. The court found that the appropriate goal should remain substitute care pending termination of parental rights.

¶ 11    On August 3, 2021, the trial court conducted a third permanency review hearing. The trial court considered DCFS and CASA reports, as well as two letters from therapists at the Ecker Center and Greater Elgin Family Care, which indicated Amanda was complying with therapy and medication treatment programs, including Suboxone treatments, and her drug tests were appropriate. The trial court found that Amanda had made efforts, but not reasonable or substantial progress and the goal remained substitute care.

¶ 12    On March 22, 2022, a fourth permanency review hearing was held. The trial court reviewed notes provided by Amanda from her psychiatrist indicating she was in remission from bipolar disorder and diagnosed with attention deficit disorder and prescribed aripiprazole and dextroamphetamine. Amanda offered documents from Ecker Center that showed she completed 31 sessions and three reassessments as of January 10, 2022, and that it was recommended Amanda be discharged satisfactorily from treatment. The trial court found that Amanda was working on her individual goals but had not shown how she addressed the root causes of her case coming into court, and the goal remained substitute care.

¶ 13    On June 22, 2022, an order of protection was entered prohibiting Amanda from contacting the foster parents or Au.F. or Al.F. due to threatening communication. We also note that throughout these proceedings, the trial court repeatedly admonished Amanda regarding her conduct when appearing via Zoom. Specifically, because these are closed, confidential, sensitive proceedings,

Amanda was instructed to appear in private. Amanda repeatedly caused disruptions in the publicly accessible Zoom lobby and also appeared via Zoom from settings in which other persons were in the background, and thus able to overhear what was occurring in court. After several violations of the court's direction regarding Zoom, the trial court ordered Amanda to appear in court in person for future proceedings. Amanda did not comply with that direction either, and thus elected to be absent from future hearings.

¶ 14    On July 12, 2022, William surrendered his parental rights and consented to the adoption of Au.F. and Al.F. by their foster parents.

¶ 15    The hearing on the State's termination of parental rights petition began on August 15, 2022. We note that Amanda initially filed a request to continue the trial so that she could appear in person. Then, she subsequently requested another continuance so that she could appear via Zoom. The trial court declined to delay the case any further and Amanda did not personally appear at further hearings. After the unfitness hearings, the trial court found that Amanda was unfit based on clear and convincing evidence of each count alleged in the State's petition. The trial court further determined that it was in the children's best interests to terminate her parental rights. There were no post-hearing motions. Amanda timely appealed.

¶ 16                                    II. ANALYSIS

¶ 17    As noted, Amanda's appellate counsel filed a motion to withdraw. Counsel's motion states that he has thoroughly reviewed the record, researched the applicable statutes and case law, and concluded that there are no meritorious issues to be raised on appeal. Counsel's motion includes a thorough statement of facts, analyzes each count for which Amanda was found unfit, and ultimately explains why this appeal presents no nonfrivolous issues. Counsel further states that he served Amanda with a copy of the motion by email at an email address provided by Amanda for

privacy, because she lived out of state in Florida. We advised Amanda that she had 30 days to respond to the motion. Amanda filed a four-page reply which we considered.

¶ 18    In his motion to withdraw, counsel discusses the evidence in the record and explains why he believes there is no reasonable argument that the trial court's finding of unfitness or termination of parental rights, was against the manifest weight of the evidence. Upon review of the record, we agree with counsel's assertions.

¶ 19    The Juvenile Court Act of 1987, 705 ILCS 405/1 *et seq*. (West 2018), provides a two-stage process for involuntary termination of parental rights. The trial court initially holds an unfitness hearing, during which the State must prove the parent is unfit, as defined in section 1(D) of the Adoption Act, by clear and convincing evidence. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). If the court finds the parent to be unfit, the court then conducts a best-interests hearing to determine, by the preponderance of the evidence, whether it is in the best interests of the child to terminate the unfit parent's rights. *Id*. We will reverse a trial court's unfitness or best-interests determination only if they are against the manifest weight of the evidence. *In re S.H.*, 2014 IL App (3d) 140500, ¶¶ 28, 34. A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

¶ 20    We first address unfitness. Section 1(D) of the Adoption Act provides various grounds under which a parent may be found unfit and, here, the trial court found Amanda unfit on all three grounds alleged in the State's petition. Counsel addresses each of these findings in his motion and argues no meritorious arguments could be made with respect to all three counts. We agree.

¶ 21    We note that any one count, properly proven, is sufficient to sustain a finding of parental unfitness. See *In re D.C.*, 209 Ill. 2d 287, 296 (2004). Accordingly, we first review the trial court's

finding that Amanda failed to protect the children from an environment injurious to their welfare. This count is supported by the multiple documented occurrences of Au.F. being found walking around on his own when he was a toddler. The petition also asserts that this failure to supervise not only endangers Au.F., but also Al.F. We agree. The Elgin Police Department documented finding Au.F. on multiple occasions, when he was approximately 3 years old, wandering unsupervised away from the home. On the occurrence that instigated this case, he was found in the parking lot of a strip mall across the street from William's house where he was last left in the backyard. An onlooking couple noticed him and observed that he was alone for more than 15 minutes and they called the police. Amanda and William had been instructed to install sliding chain locks above the height of the door handle because it was known that Au.F. could reach the door handles and let himself out of the home. At least one of these chain locks was not engaged at the time Au.F. left the yard.

¶ 22    The record reflects that Amanda and William had multiple episodes of domestic violence which resulted in the police being called, and DCFS becoming involved over 10 times. Amanda failed to complete any domestic violence services, and repeatedly exposed the children to traumatic incidents. Amanda failed to comply with the safety plan, engaged in continued substance abuse, repeatedly tested positive for substances not prescribed to her, and failed to complete recommended counseling and drug treatments.

¶ 23    The children's wellbeing and development were impacted by these events. Au.F. is diagnosed with ADHD and PTSD. He is behind in academic subjects for his grade level. Al.F. is diagnosed with PTSD and she is behind in the social and emotional areas for her grade level. Both children have been to substantial therapy and continue to require resources.

¶ 24    There is no fixed definition for "injurious environment," but it has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' "  *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)). We agree with counsel that the trial court's determination that Amanda breached her parental duty of ensuring a safe shelter for the minor children was not against the manifest weight of the evidence.

¶ 25    Next, we determine whether there are any potentially meritorious issues regarding the trial court's best-interests determination. At this stage, we consider the children's welfare and whether the termination of a parent's rights will improve their future. See *In re D.M.*, 336 Ill. App. 3d 766, 771-72 (2002). "The issue is no longer whether parental rights can be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 26    When considering whether termination of parental rights is in a child's best interests, the trial court must consider a number of factors within the context of the child's age and developmental needs including: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05)(a)-(j) (West 2018). At this point in the proceedings, a parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 34.

¶ 27    As counsel notes, the trial court considered the statutory factors, and during the best-interests hearing found that both minors have a close relationship with their foster parents, a foster sibling who was born after they were already placed in the home who they consider a sibling, and their extended maternal foster family who live nearby. The children have ties to the community through numerous sports activities, including swimming, gymnastics, tennis, soccer, and basketball; the activities are different for each of them according to their interests. Additionally, the children are enrolled in school and both have IEP plans in place, which the foster parents were involved in creating. The children each have their own bedroom, which includes space for clothes, toys, and play. There are other kids in the neighborhood for them to play with, and the foster parents have relationships with the parents of those children. The trial court took into consideration the GAL's opinion that both of the children be freed for adoption. The evidence overwhelmingly showed that the children are attached to their foster parents, call them "mom" and "dad," and are loved. The foster parents have facilitated therapy for both children and have seen great improvements in the children's coping mechanisms and responses.

¶ 28    The trial court weighed the evidence presented by Amanda, namely an affidavit from her mother, Jennifer. In Jennifer's experience the children were always fed, clothed, and safe. The trial court found this to be incorrect and that Jennifer "clearly had no knowledge of what these children were doing in Kindercare," pointing to Au.F.'s disruptive and violent behavior in daycare. The foster parents have indicated a willingness and intent to adopt the children. Based on the foregoing, we agree with counsel that the termination of Amanda's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 29    Finally, even though it was not raised after the hearings in a post-hearing motion, which would have allowed the trial court to address any error that may have occurred, we note that in her

response filed with this court, Amanda alleged that the trial court denied her the ability to be present at the termination hearings and was biased against her. We have carefully reviewed the record and determined that both assertions lack merit. The trial court repeatedly admonished Amanda about her conduct on Zoom and emphasized strong concerns regarding the security of information related to this case. Amanda did not heed or respect those warnings. Then, Amanda ignored the trial court's admonishment that she appear in person and sought to further delay the termination hearings.

¶ 30    The purpose of the Act is to ensure that children receive a prompt, just, and final resolution of their status rather than to remain in limbo. *In re D.L.*, 191 Ill. 2d 1, 13 (2000). Amanda was repeatedly admonished about the hearing dates in this case and her need to be present in court due to legitimate security concerns. As numerous cases instruct, "[a]lthough a parent has a right to be present at a hearing to terminate parental rights, [their] presence is not mandatory, and the trial court is not obligated to delay the proceedings until the parent chooses to appear." *In re J.P.*, 316 Ill. App. 3d 652, 663 (2000). Consequently, "[a] trial court should not hesitate to determine fitness in the absence of a parent who is attempting to manipulate the system to her or his own advantage." *Id*. The trial court had ample evidence that Amanda's requests for continuances had no basis in law or fact. Accordingly, we cannot say—and it cannot be argued—that the trial court abused its discretion in proceeding with scheduled hearings in Amanda's absence.

¶ 31    We also have carefully examined the record and discovered no hint of bias from the trial court judge. The abuse and neglect and termination proceedings here went on for *years*. Throughout the pendency of this case, the trial court displayed the patience and sensitivity that we expect of the judges who hear these cases. The court also attempted to move this case along, again, to ensure the minors' permanency and bring this case to a conclusion, rather than leave the children

in limbo. Finally, the court ensured that Amanda *personally* was aware of each court date and what was expected of her in terms of proper courtroom decorum. We are satisfied that the trial court did everything in its power to ensure the orderly administration of justice. Amanda's claim to the contrary is baseless.

¶ 32                                    III. CONCLUSION

¶ 33     For the reasons stated, we grant counsel's motion for leave to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 34     Affirmed.